## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROAMINGWOOD SEWER & WATER ASSOCIATION, | : CIVIL NO.: 1:20-cv-00640-JPW |
| | : |
| Plaintiff, | : |
| | : **JURY DEMANDED** |
| | : |
| -v- | : |
| | : |
| | : |
| NATIONAL DIVERSIFIED SALES, INC., | : |
| | : |
| Defendant. | : |

## FIRST AMENDED COMPLAINT

Plaintiff, Roamingwood Sewer & Water Association, ("Plaintiff" or "Roamingwood"), by and through their undersigned counsel, Saltz, Mongeluzzi & Bendesky, P.C., files this First Amended Complaint against Defendant, National Diversified Sales, Inc. ("NDS") and avers as follows:

## INTRODUCTION

1.    Plaintiff is a non-profit association that operates a water and sewer system exclusively for a planned residential community in the Poconos known as "The Hideout."  As part of a three-phase $97 million sewer conversion project that began in 2013, Plaintiff purchased and installed in its system 800 of Defendant's check valves between August 2017 and November 2018. Check valves attach to each home's sewer lateral pipe funneling sewage out of the home and into the

1

community's sewer system while preventing the sewage from sliding back down the lateral, clogging, and causing property damage and environmental contamination.

2.     Since installing Defendant's check valves as part of stage three of the project, 22 of them have failed in identical fashion resulting in property damage, environmental concerns, and the basic need to dig-up and replace the failed check valve to restore residential sewer service. None of the check valves installed as part of stage one or two (manufactured by different companies) have failed.

3.     After notifying Defendant of these numerous failures, and in an effort to resolve the matter without costly litigation, the parties agreed to conduct a joint microscopic investigation of the failed check valves in January 2020. That examination established that the flapper in Defendant's check valves suffer from a uniform defect (described more fully *infra.*) that render them unmerchantable.

4.      Plaintiff demanded that Defendant issue a recall and replace all of the defective check valves installed in its system, compensate it for the costs its incurred in replacing the failed check valves, and reimburse its member property owners for property damage they have sustained as a result of these failures. Each stage three check valve currently installed poses a substantial environmental risk should it fail. Defendant refuses.

5.     Plaintiff now brings this action for (1) strict liability, (2) breach of the implied warranty of merchantability, (3) negligence, and (4) violations of the Pennsylvania Uniform Trade Practices and Consumer Protection Act, 73 P.S. § 201-2, *et. seq.*  Plaintiff seeks damages in the amounts it paid to replace failed check valves, the costs it will incur replacing the remaining check valves still installed, and the costs it will incur to reimburse property owners for property damages sustained as a result of the failed check valves.

## JURISDICTION

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), because the parties are citizens of different states, Pennsylvania and California, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.     Defendant is subject to personal jurisdiction in this district. Defendant conducts substantial business in this district.

8.     Further, a substantial portion of the acts and course of conduct giving rise to the claims alleged herein occurred within the district. Thus, venue is proper in this district.

## PARTIES

9.     Plaintiff, Roamingwood Sewer & Water Association, is a duly registered Pennsylvania not-for-profit corporation, a cooperative operated under the

3

laws of the Commonwealth of Pennsylvania and within the provisions of Section 501(c)(12) of the Internal Revenue Code. *See* Exhibit A at 1 (Roaming Sewer and Water Association By-Laws, May 14, 2003).

10.     As a non-profit cooperative, Roamingwood operates exclusively for the benefit of its members. Roamingwood's by-laws define its members as those owners of property at the residential community known as "The Hideout" in the Townships of Lake and Salem, Wayne County, Pennsylvania.  *Id*. at 3.

11.     Roamingwood's by-laws set forth its purpose, *inter alia*, as  "supply water and service to the residential development known as 'The Hideout'…to assure that the [Homeowner's] Association and its Members…fair and reasonable water and sewer rates; [and] to assure regular, continuous, and reliable and sewer service for the Association and for the Members..." *Id*. at 2.

12.     Roamingwood's business and property are managed and governed by a Board of Directors who are members (*i.e,* residential homeowners in "The Hideout" community) in good standing. *Id*. at 7.  The Board of Directors has the power "to carry out all agreements of Roamingwood with its members in every way advantageous to Roamingwood representing the members collectively." *Id*. at 8. The Board is expressly charged with the responsibility to "[c]are, upkeep, and survey[]" the facilities of Roamingwood for the benefit of the residential community. *Id*. at 9.

4

13.     Defendant, National Diversified Sales, Inc. ("NDS"), is a California corporation with its principal place of business in Woodland Hills, California.  NDS is engaged in the design, manufacture, marketing, distribution and sale of sewer system management solutions.

14.     NDS is a subsidiary of the NORMA Group SE, which acquired NDS in October 2014 for $285 million. The NORMA Group is a German-based company that manufactures a wide range of innovative joining technology solutions in three product categories (clamp, connect and fluid) and offers more than 30,000 products and solutions to around 10,000 customers in 100 countries.

## FACTUAL BACKGROUND

### A.     Plaintiff's Capital Improvement Project

15.     The Hideout residential community was originally planned in March 1969 with the purchase of 68 acres of farmland. Construction of the initial water and sewer systems took place in 1971 – 1973, and most of the sewer system in The Hideout was installed between 1971 and 1973.

16.     The first "Hideout" property was sold in July 1970, and the first homes were begun soon thereafter. By 1973, the community boasted in excess of 200 homes "serviced by central sewerage and water," an unusual amenity in those first years of recreational community development in the Pocono area. The peak home building period for The Hideout was 1986 – 1988.

17.    While "The Hideout" has some year-round residents, a large majority of the homes are used as summer vacation retreats.

18.    Beginning in approximately 2013, Plaintiff, with the authorization of its Board of Directors, undertook a $97 million capital improvement project that involved a complete replacement of is sewer collection and water delivery systems to the residential community.  At the time, it was the largest sewer conversion project of its kind in the United States.

19.    Plaintiff's original sanitary sewer system was a "gravity system."  In a gravity system, gravity is utilized, and the wastewater simply flows downhill to a collection area. Pump stations supplement the gravity system to move wastewater up inclines where necessary.

20.    Plaintiff's improvement project called for switching the entire system from a "gravity system" to a low-pressure system.  Low-pressure sewer systems use grinder pumps that turns solids into slurry that can be piped without regard for slope or groundwater depth. Pressure sewer systems are less invasive and less expensive to install. Maintenance is minimal with electricity to power the pump as the primary cost.

21.    As part of Plaintiff's improvements, the new low-pressure lines were located on the other side of the street from the former gravity line. Work was

completed in stages from pump station to pump station with temporary hook-ups to the gravity line. At the curb of each property is a curb stop for waterlines, and another for sewer lines. Prior to this project, every property had a curb stop for water, but there were none for sewer lines.

22.    A critical component of the low-pressure system is the check valve. The check valves connect a home's lateral sewer line to the community sewer line underground. The check valve contains an internal flapper that allows sewage to flow out, but then closes to prevent the sewage from flowing in the reverse direction, back down the home's lateral, ultimately causing a backup of sewage into the home or the lateral to explode underground between the street and home. Functionality of the flapper in the check valve is critical.

**B.    NDS's Defective Check Valves**

23.    Due to the size, scope and cost associated with the project, Plaintiff staged the project into three stages.  In stage one and two of the project, which ran from 2013-2017, Plaintiff used check valves manufactured by King Brothers Industries ("KBI").

24.    At some point prior to the beginning of stage three, KBI's business was acquired by Defendant NDS.[1]

---

[1] Plaintiff did not purchase check valves directly from NDS.  The valves were part of an assembly purchased from Lee Supply Co., Inc., in Downingtown,

25.    NDS, prior to stage 3, changed the design and/or manufacture of the KBI check valves. The stage three check valve units have two white plastic pieces, welded together on either side of a black rubber gasket, which comprise the flapper. The plastic that faces the street is slightly larger than the plastic piece that faces the property's lateral.   These two white plastic pieces provide weight so the rubber gasket only swings in one direction and does not allow sewage to escape backward. (*See* Figure 1 below).

 

*Figure 1: <u>White Plastic Pieces Fused together on Either Side of Rubber Gasket</u>*

---

Pennsylvania, who in turn purchased them from The Lateral Connection Corporation in Langley, British Columbia, Vancouver.

26.     By comparison, the stage two check valves manufactured by KBI, have

an entirely different flapper design that is more robust.  (*See* Figure 2).



*Figure 2: **Stage 2 Check Valve Flapper Design and External Body***

27.    Between 2017-2019, the re-designed NDS check valves were installed for the 800 stage three properties.

28.    The stage three NDS check valves were specifically rated as being able to withstand 200 psi working pressure. Plaintiff's low-pressure system produces a maximum 67 psi, so based on Defendant NDS's affirmative and material representation about the valve's pressure thresholds, the valves should have been able to easily withstand Plaintiff's system maximum pressure.

29.    After installation of the stage three check valves, between May 27, 2018 and February 12, 2020, 22 NDS check valves failed in identical fashion causing environmental contamination due to the release of raw sewage and damage to property requiring that Plaintiff dig-up, remove, and replace the failed check valve at considerable cost.

30.    Plaintiff has also been subjected to litigation from homeowners whose property suffered a sewage back-up as a result of the failed check valve, *Schaub v. Roamingwood Sewer*, Case No. 532-cv-2019 (Wayne Cty.). Because of the uniform nature of the defect (as discussed below), Plaintiff reasonably anticipates additional failures, damages, and more litigation.

31.    Importantly, there have been no reported problems with any check valves installed as part of either stage one or stage two.

32.     Plaintiff further understands that NDS had received, and therefore was on notice, of multiple failures of its check valve flapper failures. NDS was previously found to be 100% negligent for the distribution of a check valve used for swimming pools after its flapper failed and resulted in personal injury. *See Postil v. National Diversified Sales, Inc., et al.*, 2016 WL 5243139 (Ariz. Super. July 29, 2016) (liability verdict against NDS award of $250,000 in damages to plaintiff).

33.     As a result, at all times material, NDS had actual knowledge of the problems with its check valve's flapper and knew, prior to distributing them to Plaintiff, that they were defective and not merchantable for their intended use.

34.     Plaintiff understands that NDS has since discontinued manufacturing the stage three check valves in their entirety.

**C.     The Parties' Joint Microscopic Inspection Reveals Defect**

35.     Plaintiff notified Defendant NDS of the first failures as early as December 2018.

36.     After much back and forth, followed by a period of silence, in January 2020, NDS assigned outside counsel to engage Plaintiff in discussions about the repeated stage three check valve failures.

37.     The parties agreed to conduct a joint visual and microscopic examination of 10 failed check valves at a third-party lab suggested by NDS, Micron, Inc., in Wilmington, Delaware, on January 29, 2020.

11

38.     As part of the parties' joint protocol, the failed units were placed under microscopic inspection. As described above, the stage three check valve flapper is made up of two white plastic pieces, welded together on either side of a black rubber gasket.

39.     The microscopic examination revealed that the ultrasonic weld intended to hold the two white plastic pieces together was incomplete.  As a result, during routine use, the white plastic's bond would fail, cause the white plastic parts to separate, and consequently cause the flapper to fail.  Once the rubber gasket lost the weight of the plastic, sewage could easily slide back down the lateral into the property. (*See* Figure 3 below).



*Figure 3: <u>Separated Plastic (photos 1 & 2 l-r) and Rubber Intact Rubber Gasket (photo 3))</u>*

40.     Following the joint inspection at Micron, NDS informed Plaintiff that they would provide a full report of the findings and all associated photographs.  To

date, after repeated requests, no such report or photographs have been produced.

**D.    Plaintiff's Current and Future Damages**

41.    Following the 22 identical failures, there remain 778 check valves currently installed in stage three of Plaintiff's system.

42.     Plaintiff has ***no*** confidence that once the summer season returns and the Hideout's resident re-populate their homes that the NDS stage three check valves will withstand the increase load on the system. In fact, as it stands, Plaintiff does not know, nor will it know, until the seasonal residents fully return whether there have been additional failures. These defective check valves need to be removed from the ground and replaced to avoid additional failures, environmental contamination from the release of raw sewage, and property damage.

43.    In addition to replacing the check valves in the ground, Plaintiff has already incurred costs associated with the 22 check valve failures, including costs for its own labor and expenses, payments to its general contractor, professional engineering fees, as well as costs associated with engaging its attorneys.

44.    Lastly, Plaintiff faces, as of now, three different homeowner claims for property damages caused by the failed check valves.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Strict Liability

45.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

46.     Defendant is engaged in the business of manufacturing, distributing and selling valves for use in public sewer and water management systems.

47.     The valves sold by Defendant reached Plaintiff without any substantial change in their condition.

48.     Under both the consumer expectations standard and the risk-utility analysis, Defendant's check valves are defective.

49.     The check valves failed to meet an ordinary consumer's minimum expectations.

50.     The check valves did not perform as an ordinary consumer would have expected them to perform when used in a reasonably foreseeable way and/or the manner in which it was intended by Defendant.

51.     The defects in the check valves renders them unable to perform as an ordinary consumer would expect.

52.     As a direct and proximate result of the check valves being put into the stream of commerce by Defendant, Plaintiff has been injured and has suffered

14

damages.

53.     Defendant is strictly liable for all injuries suffered by Plaintiff as a result of the defective check valve.

## SECOND CAUSE OF ACTION
### Breach of Implied Warranty of Merchantability and
### <u>Fitness for a Particular Purpose</u>

54.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

55.     Defendant is a merchant who impliedly warranted to Plaintiff that its check valves were free of defects and were merchantable and fit for the ordinary purpose for which such goods are used.

56.     Defendant knew or had reason to know at the time of sale that the check valve was required for a particular purpose and that Plaintiff relied on Defendant's skill or judgment to select or furnish such goods.

57.     Defendant breached the implied warranty of merchantability because the check value uniformly possesses the flapper defect.  The check valves are therefore defective, unmerchantable, and unfit for the ordinary, intended purpose at the time of sale.

58.     Further, the check valves were for low-pressure – rated up to 200 psi- for sewer systems and Plaintiff was relying on the expertise of Defendant to make

these valves to that specification so they would not fail under normal conditions.

59.    The warranty of fitness for a particular purpose is more exacting than the warranty of merchantability.  It requires that the seller had reason to know of the buyer's particular purpose at the time of contracting and that the buyer was relying on the seller's expertise.  In that case, the goods are implicitly warranted to be fit for that particular purpose. 13 Pa. Cons. Stat. § 2315.

60.    Defendant breached the implied warranty of fitness when it knowingly distributed and sold check valves it knew were not fit for their purpose.

61.    After Plaintiff learned of the failures, it gave reasonable and adequate notice to Defendant that its check valves are defective, unmerchantable, and unfit for their intended use or purpose.  Defendant has failed to cure.

62.    Plaintiff did not receive or otherwise could review, at or before the time of purchase, any written warranty containing any purported exclusions or limitations of remedies.  Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiff is entitled to all remedies available under Article 2 of the Uniform Commercial Code.

63.    As a direct and proximate result of the breach of implied warranty, Plaintiff has been injured in an amount to be proven at trial, including replacement of the defective check valves currently installed in stage three.

## THIRD CAUSE OF ACTION
### <u>Negligence</u>

64.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

65.     Defendant manufactured and/or distributed defective check valves.

66.     At all times relevant to this action, Defendant had a duty to exercise reasonable care over the check valves it manufactured, including a duty to ensure that the check valve's flapper would operate as intended and not fail.

67.     Defendant breached this duty by selling the check valves in a defective condition.

68.     Defendant knew or should have known that the check valves were defective and could cause significant property damage.

69.     Defendant breached its duty of reasonable care to Plaintiff by failing to exercise due care under the circumstances.

70.     As a direct and proximate result of Defendant's acts and omissions, including its failure to exercise reasonable care in the design, manufacture, sale and distribution of check valves, Plaintiff has suffered damage.

### FOURTH CAUSE OF ACTION
### Pennsylvania Unfair Trade Practices and Consumer Protection Law
### 73 P.S. §§ 201-1-201-9.2

71.    Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

72.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") makes unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

73.    Plaintiff as an "association" is a "person" under the UTPCPL.  73 P.S. § 201-2(2) ("'Person' means natural persons, corporations, trusts, partnerships, incorporated or unincorporated *associations*, and any other legal entities") (emphasis added); *see also id.* at § 201-9.2(a) ("Any ***person*** who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 [(73 P.S. § 201-3)] of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater.") (emphasis added).

74.    Defendant is a manufacturer, marketer, seller, and/or distributor of the check valves.

18

75.     Plaintiff purchased the check valves exclusively for the purpose of providing and maintaining its residential sewage system that each homeowner at the Hideout utilizes for personal, household and family sewage waste disposal. The residential sewage system is essential to the integrity, functionality, and purpose of the Hideout community.

76.     The conduct described in this Complaint constitutes unfair methods of competition or unfair or deceptive acts or practices pursuant to §§ 201-2(4)(v), (vii) and (xxi) of the UTPCPL.

77.     In violation of the UTPCPL, Defendant represented that its check valves could withstand 200 psi during use and further omitted and/or concealed that its check valves had been subject to flapper failures like the ones Plaintiff experienced.

78.     The misrepresentations and omissions were made to ensure that its check valves would be sold, distributed, and installed.

79.     Defendant knew or should have known that its representations about the check valves were false, that the check valves were defectively designed and/or manufactured and otherwise were not as warranted and represented.

80.     Defendant knew or should have known, at the time the check valves left its control, they contained defects making them prone to flapper failure resulting

in the back-up of sewage, environmental contamination, and property damage.

81.    Plaintiff relied on the representation that Defendant's check valves were capable of withstanding pressures up to 200 psi.

82.    As a direct and proximate result of the Defendants UTPCPL violations described above, Plaintiff has been injured in that they purchased and installed defective check valves into its sewage system, which need to be replaced to avoid environmental contamination and property damage.

83.    The foregoing acts, misrepresentations, and omissions caused Plaintiff to suffer an ascertainable loss in the form of monies paid to purchase the defective check valves, monies to repair and replace defective check valves, and monies to compensate homeowners for property damage.

84.    Plaintiff is entitled to recover such damages, trebled, as well as reasonable attorneys' fees and costs of suit.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests the Court provide it the following relief:

A.    Enter a finding that the Defendant's check valves are defective;

B.    Enter judgment in Plaintiff's favor against Defendant on

all counts;

C.    Award Plaintiff damages in the amount to be determined, including but not limited to, monies expended to replace failed check valves, monies to replace the remaining stage three check valves, and monies to compensate property owners who have suffered damage from the failed check valves;

D.    Award Plaintiff treble damages as permitted by the UTPCPL based on Defendant's knowledge of the defective condition of the check valve at the time of distribution and sale;

E.    Award Plaintiff any other relief the Court deems just and appropriate; and

F.    Award Plaintiff its reasonable attorneys' fees and cost of suit pursuant to 73 Pa. C.S. § 201-9.3.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Date: May 12, 2020          By: _____

Larry Bendesky, Esquire
Simon B. Paris, Esquire
Patrick Howard, Esquire
Charles J. Kocher, Esquire
**SALTZ, MONGELUZZI &
BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel:(215) 575-3895
Email:   LBendesky@smbb.com
         SParis@smbb.com
         PHoward@smbb.com
         CKocher@smbb.com

*Counsel for Plaintiff*