**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROAMINGWOOD SEWER & WATER ASSOCIATION, | : | CIVIL NO.: 1:20-cv-00640-JPW |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | **JURY DEMANDED** |
| | : | |
| -v- | : | |
| | : | |
| | : | |
| NATIONAL DIVERSIFIED | : | |
| SALES, INC., | : | |
| | : | |
| Defendant. | : | |

**ROAMINGWOOD SEWER & WATER**
**ASSOCIATION'S OPPOSITION TO DEFENDANT NATIONAL**
**DIVERSIFIED SALES, INC.'S MOTION TO DISMISS**

# TABLE OF CONTENTS

I.     INTRODUCTION ......................................................................... 1

II.    FACTUAL BACKGROUND ....................................................... 2

    A.    "The Hideout," Plaintiff, and Its Capital Improvement Project ......... 2

    B.    Defendant's "Check Valves" Fail in Uniform Fashion...................... 4

    C.    A Joint Inspection Reveals the "Check Valves" Defect..................... 5

III.   STANDARD OF REVIEW ........................................................ 6

    A.    Rule 12(f) Motion to Strike.......................................................... 6

    B.    Rule 12(b)(6) Motion to Dismiss ................................................. 7

IV.    ARGUMENT ............................................................................... 8

    A.    Defendant's Rule 12(f) Motion Fails to Meet the Heightened
        Standard....................................................................................... 8

        1.    FAC Paragraph 14 ................................................................ 9

        2.    FAC Paragraph 32 ............................................................. 11

    B.    Plaintiff's Claims Are Not Barred by the Economic Loss Doctrine.. 12

    C.    Plaintiff Has Standing to Pursue a UTPCPL Claim......................... 15

        1.    UTPCPL's Statutory Framework .......................................... 15

        2.    Roamingwood's Purchase of the Check Valves Were for
            Personal, Family or Household Use ....................................... 18

    D.    Plaintiff's Damages are not Speculative.......................................... 20

V.     CONCLUSION ......................................................................... 22

**TABLE OF AUTHORITIES**

**Cases**

*2-J Corp. v. Tice*, 126 F.3d 539 (3d Cir. 1997)..................................................... 14

*Amig v. County of Juniata*, 2020 WL 102998 (M.D. Pa. 2020) ............................ 13

*Anadarko Petroleum Corporation v. Commonwealth*, 206 A.3d 51
   (Pa. Cmwlth. 2019)........................................................................................ 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009).................................................................7, 8

*Bilt-Rite Contractors v. The Architectural Studio*, 866 A.2d 270 (Pa. 2005)...12, 13

*Bishop v. JP Morgan Chase & Co.*, 2014 WL 1382393 (D. Del. 2014) ................ 7

*Blanche Road Corp. v. Bensalem Twp.*, 57 F.3d 253 (3d Cir. 1995) .................... 21

*Boehm v. Riversource Life Ins. Co.*, 117 A.3d 308 (Pa. Super. 2015)..............10, 20

*DeLa Cruz v. Piccardi Press*, 521 F.Supp.2d 424 (E.D. Pa. 2007)........................ 7

*Dittman v. UPMC*, 196 A.2d 1036 (Pa. 2018).................................................*passim*

*Donnelly v. Commonwealth Fin. Sys.*, 2008 WL 762085
   (M.D. Pa. Mar. 20, 2008).................................................................................. 8

*Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840 (Pa. 2009).... 12

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) .................................... 7

*Johnson v. Anhorn*, 334 F.Supp. 2d 802 (E.D. Pa. 2004) ...................................... 6

*Johnson v. Diamondrock Frenchman's Owners, Inc.*, 2010 WL 11622808
   (D. Virgin Islands April 13, 2010)...................................................................... 6

*Richards v. Ameriprise Financial, Inc.*, 217 A.3d 854 (Pa. Super. 2019) ............. 20

*River Road Dev. Corp. v. Carlson Corp.-Northeast*, 1990 WL 69085
   (E.D. Pa. May 23, 1990).................................................................................... 6

*Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875 (1997).................... 14

*Savvy Dog Systems, LLC v. Pennsylvania Coin, LLC*, 2020 WL 1550676
   (M.D. Pa. April 1, 2020)....................................................................................... 8

*Schwartz v. Rockey*, 932 A.2d 885 (Pa. 2007) ...................................................... 10

*Silva v. Rite Aid Corp.*, 416 F. Supp. 3d 394 (M.D. Pa. 2019)........................12, 20

*United States v. Sensient Colors, Inc.*, 580 F.Supp.2d 369 (D.N.J. 2008).............. 7

*Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc.*,
   574 A.2d 641 (Pa. Super. 1990)....................................................... 15, 16, 18, 19

*Zaloga v. Provident Life and Acc. Ins. Co. of America*, 671 F.Supp.2d 623
   (M.D. Pa. 2009) ...........................................................................................*passim*

## Other Authorities

Pennsylvania Unfair Trade Practices and Consumer Protection Law .............*passim*

## Rules

Rule 8 ....................................................................................................................7, 8
Rule 12(b)(6) .....................................................................................................1, 7, 22

## I. INTRODUCTION

Plaintiff, Roamingwood Sewer & Water Association ("Plaintiff" or "Roamingwood") offers this Memorandum of Law in Opposition to Defendant NDS's ("NDS") Motion to Strike and to Dismiss Plaintiff's First Amended Complaint ("FAC").

Defendant's motion fails in all material respects. *First*, the motion to strike fails to articulate why certain paragraphs of the FAC contain "redundant, immaterial, impertinent, or scandalous matter" as required prior to the Court taking the drastic step of altering the pleadings. Hollow claims of prejudice do not satisfy Rule 12(f)'s rigorous standard.

*Second*, Defendant pays short shrift to a controlling ruling from the Pennsylvania Supreme Court in arguing that Plaintiff's negligence and strict liability claims are barred by the economic loss doctrine. Courts in this district recognize that, in 2018, the Court altered Pennsylvania's economic loss jurisprudence to allow claims where personal injury or property damage is not alleged. Defendant's motion to dismiss Plaintiff's claims in this regard, likewise, fails.

*Lastly*, Plaintiff's FAC makes clear it has standing to pursue claims under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq*. ("UTPCPL"). Plaintiff is an association which falls squarely into the

UTPCPL's definition of "person." And, Plaintiff only acts by and through its members who are residential homeowners in a private community. The UTPCPL's jurisprudence also makes clear that purchases by an association in this capacity are for "personal, family, or household use."[1] Defendant's motion should be denied.

## II. FACTUAL BACKGROUND

### A. "The Hideout," Plaintiff, and its Capital Improvement Project

"The Hideout" is a residential community that was originally planned in March 1969 with the purchase of 68 acres of farmland. ¶15.[2] Construction of the initial water and sewer systems took place in 1971 – 1973. *Id*. By 1973, the community boasted in excess of 200 homes "serviced by central sewerage and water," an unusual amenity in those first years of recreational community development in the Pocono area. ¶16. While "The Hideout" has some year-round residents, a large majority of the homes are used as summer vacation retreats. ¶17.

"The Hideout's" central sewerage and water system is operated by Plaintiff, which is a registered Pennsylvania not-for-profit corporate cooperative. ¶9. Plaintiff operates exclusively for the benefit of the residential property owners at the "The Hideout." ¶10. Roamingwood's by-laws set forth its purpose as "supply water and service to the residential development known as 'The Hideout'…to

---

[1] NDS did not move to dismiss Count II of the FAC (Breach of Implied Warranty).

[2] All citations to "¶" refer to the FAC, Dkt No. 9.

assure that the [Homeowner's] Association and its Members…fair and reasonable water and sewer rates; [and] to assure regular, continuous, and reliable and sewer service for the Association and for the Members..." ¶11 Roamingwood's business and property are managed and governed by a Board of Directors who are members (*i.e,* residential homeowners in "The Hideout" community) in good standing. ¶12. The Board of Directors has the power "to carry out all agreements of Roamingwood with its members in every way advantageous to Roamingwood representing the members collectively." *Id.*

Beginning in approximately 2013, Plaintiff, with the authorization of its Board of Directors, undertook a $97 million capital improvement project that involved a complete replacement of is sewer collection and water delivery systems to the residential community. ¶18 Plaintiff's improvement project called for switching the entire system to a low-pressure system. ¶20. A critical component of the low-pressure system is the check valve. ¶22. The check valves connect a home's lateral sewer line to the community sewer line underground. *Id.* The check valve contains an internal flapper that allows sewage to flow out, but then closes to prevent the sewage from flowing in the reverse direction, back down the home's lateral, ultimately causing a backup of sewage into the home or in the lateral causing it to explode underground. *Id.* Functionality of the flapper in the check valve is critical. *Id.*

3

## B. Defendant's "Check Valves" Fail in Uniform Fashion

NDS is a California corporation that is engaged in the design, manufacture, marketing, distribution and sale of sewer system management solutions. ¶13. Plaintiff staged its project in three separate phases due to its size and cost. ¶23. In the first two phases, Plaintiff used check valves designed and manufactured by companies other than NDS. *Id.* For stage three, NDS check valves were installed at 800 residential properties. ¶27.[3]

Unlike the check valves used in the first two stages, the flapper in the NDS check valve (the critical component to contain sewage) has two white plastic pieces welded together so the rubber gasket on the flapper only swings in one direction. ¶25. The stage three NDS check valves were specifically rated as being able to withstand 200 psi working pressure. ¶28. Plaintiff's low-pressure system produces a maximum 67 psi, so based on Defendant NDS's affirmative and material representation about the valve's pressure thresholds, the valves should have been able to easily withstand Plaintiff's system maximum pressure. *Id.*

After completing installation of the NDS stage three check valves, the flapper on 22 check valves failed in identical fashion between May 27, 2018 and

---

[3] Plaintiff did not purchase check valves directly from NDS. The valves were part of an assembly purchased from Lee Supply Co., Inc., in Downingtown, Pennsylvania, who in turn purchased them from The Lateral Connection Corporation in Langley, British Columbia, Vancouver. ¶24, n.1.

February 12, 2020.[4] ¶29. The two white plastic pieces on the flapper separated and allowed raw sewage to flow back down the residential lateral pipe and into the home. ¶39. The flapper failure caused environmental contamination and damage to property requiring that Plaintiff dig-up, remove, and replace each of the 22 failed check valves at considerable cost. ¶29. Plaintiff is now subjected to litigation from at least one homeowner whose property suffered a sewage back-up as a result of the failed check valve and expects more. ¶30.

Importantly, there have been no reported problems with any check valves installed as part of either stage one or stage two. ¶31.

### C. A Joint Inspection Reveals the "Check Valves" Defect

Plaintiff notified NDS of the first failures as early as December 2018. ¶35. After years of back and forth, the parties agreed to conduct a joint examination of 10 failed check valves at a third-party lab suggested by NDS, Micron, Inc., in Wilmington, Delaware, on January 29, 2020. ¶37. The microscopic examination revealed that the ultrasonic weld intended to hold the two white plastic pieces together was incomplete. ¶39. During routine use, the white plastic's bond will fail, cause the white plastic parts to separate, and consequently cause the flapper to fail. *Id*. Once the rubber gasket lost the weight of the plastic, sewage could easily slide back down the lateral into the property. *Id.*

---

[4] Although outside the four corners of the FAC, Plaintiff experienced another check valve failure on May 14, 2020 bringing the total to 23.

After the inspection, NDS did not provide Plaintiff with any photographs or findings. ¶40. Plaintiff filed its Complaint against NDS on April 20, 2020. Dkt. No. 1. NDS moved to strike and dismiss on May 7, 2020. Dkt. No. 7. Plaintiff filed its FAC on May 12, 2020. Dkt. No. 9. Defendant, again, moved to strike and dismiss on May 19, 2020. Dkt. No. 11.

## III. STANDARD OF REVIEW

### A. Rule 12(f) Motion to Strike

Rule 12(f) provides that "the Court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The standard for striking a complaint or a portion of it is strict, and "only allegations that are so unrelated to the plaintiffs' claims as to be unworthy of any consideration should be stricken." *Johnson v. Anhorn*, 334 F.Supp. 2d 802, 809 (E.D. Pa. 2004) (citations omitted). To prevail on a motion to strike, the moving party must show that "the allegations have no possible relation to the controversy and may cause prejudice to one of the parties or [that] the allegations confuse the issues." *River Road Dev. Corp. v. Carlson Corp.-Northeast*, 1990 WL 69085, at *3 (E.D. Pa. May 23, 1990). "Striking a party's pleading, however, is an extreme and disfavored measure." *Johnson v. Diamondrock Frenchman's Owners, Inc.*, 2010 WL 11622808, at *1 (D. Virgin Islands April 13, 2010). In deciding the motion, a court should also consider the liberal pleading standards of Rule 8 and the lack of a developed factual record at

this early stage. *Zaloga v. Provident Life and Acc. Ins. Co. of America*, 671 F.Supp.2d 623, 633 (M.D. Pa. 2009) (citations omitted).

Motions to strike are decided on the pleadings alone. *Id.* (*citing DeLa Cruz v. Piccardi Press*, 521 F.Supp.2d 424, 429 (E.D. Pa. 2007)). Matters outside the pleadings normally are not considered on a Rule 12(f) motion. *Bishop v. JP Morgan Chase & Co.*, 2014 WL 1382393, at *3 (D. Del. 2014) (*citing United States v. Sensient Colors, Inc.*, 580 F.Supp.2d 369, 374 (D.N.J. 2008)). Thus, the Court must determine a motion to strike on the basis of the pleadings alone. *Id.*

### B. Rule 12(b)(6) Motion to Dismiss

After *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), a two-part analysis is required when a court evaluates a motion to dismiss for failure to state a claim. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). "First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* Second, the court must "then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief." *Id.*

"A complaint need not contain detailed factual allegations, to survive a Rule 12(b)(6) motion, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Savvy Dog Systems, LLC v.*

*Pennsylvania Coin, LLC*, 2020 WL 1550676, at *3 (M.D. Pa. April 1, 2020) (*quoting Ashcroft*, 556 U.S. at 678) (additional quotation omitted). "The court cannot dismiss a complaint simply because "it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Id.* (internal quotations and citations omitted). "Rather, Rule 8 requires enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* (internal quotations and citations omitted).

## IV. ARGUMENT

### A. Defendant's Rule 12(f) Motion Fails to Meet the Heightened Standard

NDS fails to satisfy Rule 12(f)'s standard because there is nothing "redundant, immaterial, impertinent or scandalous" about the allegations in FAC. *See Zaloga*, 671 F. Supp. 2d. at 633. Courts have defined those terms for purposes of Rule 12(f) as:

> [i]mmaterial matter is that which has no essential or important relationship to the claim for relief. Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question. Scandalous matter has been defined as that which improperly casts a derogatory light on someone, most typically on a party to the action. Scandalous pleading must 'reflect cruelly' upon the defendant's moral character, use 'repulsive language' or 'detract from the dignity of the court.
>
> *Id.* (*quoting Donnelly v. Commonwealth Fin. Sys.*, 2008 WL 762085, at *4 (M.D. Pa. Mar. 20, 2008) (internal citations and quotations omitted)).

### 1. **FAC Paragraph 14**

*First*, FAC paragraph 14, relates to the parent-subsidiary relationship between NDS and its parent NORMA Group SE. ¶14. The paragraph simply describes how and when NDS became a subsidiary to the NORMA Group and the considerable cost NORMA Group paid to acquire NDS. *See id*. NDS claims, without any supporting legal authority, that the Court should take the drastic measure of striking this paragraph from the FAC because it is "unduly prejudicial or scandalous" and "bears no possible relationship to the present controversy." Def. MOL at 4. NDS is wrong.

An accurate description of a parent-subsidiary relationship could hardly be said to "reflect cruelly" on NDS; and the fact that NORMA Group paid $285 million for NDS is not "repulsive" nor does it "detract from the dignity of the court." *Zaloga*, 671 F.Supp. 2d at 633. And, the allegation is, in fact, material to the controversy. Despite its considerable assets and international presence, NDS has wholly failed to take any compensatory action in response to the 22 identical check valve failures in Plaintiff's system, which NDS itself confirmed at a joint inspection in January 2020 is due to a uniform manufacturing/design defect. ¶¶29, 35-40. The Court, in determining if treble damages are warranted under the UTPCPL, must focus its analysis on the nature of the conduct and whether it was "intentional or reckless, wrongful…as to which an award of treble damages would

be consistent with, and in furtherance of, the remedial purpose of the UTPCPL." *Schwartz v. Rockey*, 932 A.2d 885, 898 (Pa. 2007). The only reason Plaintiff filed this litigation was NDS's refusal to accept any responsibility for the defective nature of the check valves; a fact the Court may later balance against NDS's substantial wealth in evaluating a request for treble damages. *Boehm v. Riversource Life Ins. Co.*, 117 A.3d 308, 331 (Pa. Super. 2015) ("On appeal, this court upheld the award of treble damages, noting that the defendant's refusal to resolve the matter when the defect was first discovered forced the plaintiffs to bring suit[.]") (citations omitted).

Notwithstanding, without discovery, Plaintiff has no understanding of the parent-subsidiary relationship between NORMA and NDS, the level of control NORMA exercises over NDS, and what role, if any, NORMA played in the check valves design change. ¶14 ("NORMA Group…manufacturers a wide range of innovative joining technology…"); ¶25 ("NDS, prior to stage 3, changed the design and/or manufacture of the KBI check valves."); *see also Zaloga*, 671 F.Supp.2d at 633 (in deciding a Rule 12(f) motion "a court should also consider the liberal pleading standards of Rule 8 and the lack of a developed factual record at the early stage of litigation.") (citations omitted). By including reference to NORMA Group in the Complaint, NDS is on notice that it may at some point

become relevant to the litigation. Defendants' motion to strike FAC paragraph 14 should be denied.

### 2. FAC Paragraph 32

*Secondly*, NDS asks the Court to strike FAC paragraph 32 based on an unverified, extraneous document that is beyond the four corners of the FAC. As already discussed, motions to strike are decided on the pleadings alone. *Zaloga*, 671 F. Supp. 2d at 633. The Court should disregard the exhibit submitted.

Nonetheless, in *Zaloga*, the plaintiff included in his complaint, allegations regarding "[d]efendants' claims handling, risk management practices, background information about [d]efendants and the disability insurance industry, and past cases in which one or both of [d]efendants was a party." *Id*. at 634. In denying the Rule 12(f) motion, the district court reasoned that such information "connects the background information paragraphs to [plaintiff's] claim. Furthermore, [p]laintiff's citation of past court cases are provided to show that [d]efendants may have been on notice regarding criticized claims handling practices. The effect that the allegations may have on the disposition of this litigation is unknown, but to say that the allegations are irrelevant, immaterial, impertinent, or scandalous is a stretch." *Id*.

The *Zaloga's* court's reasoning applies equally here. Reference to NDS's involvement with prior litigation concerning check valves is not intended to

establish the truth of Plaintiff's assertions, but rather, that NDS had notice of potential manufacture/design problems with its check valve flapper; and that NDS refused otherwise valid claims related to check valve failures; a pattern that continues to date. Defendant's Motion to Strike Paragraph 32 should be denied.

### B. Plaintiff's Claims Are Not Barred by the Economic Loss Doctrine

NDS relies on outdated case law together with a limited reading of the Pennsylvania Supreme Court's holding in *Dittman v. UPMC*, 196 A.2d 1036 (Pa. 2018) to assert Plaintiff's negligence and strict liability claims are barred by the economic loss doctrine. NDS's arguments should be rejected. Indeed, other courts in this district recognize that "the Pennsylvania Supreme Court [in *Dittman v. Univ. of Pittsburgh Med. Ctr.*] has clarified that Pennsylvania courts are not in fact hostile to tort liability for purely economic loss; *per contra*, the court announced [in 2018] that 'purely 'economic loss' may be recoverable under a variety of tort theories.'" *Silva v. Rite Aid Corp.*, 416 F. Supp. 3d 394, 402 (M.D. Pa. 2019) (*citing Dittman*, 196 A.3d at 1036).

In *Dittman*, contrary to NDS's arguments, the Supreme Court made clear that its prior holdings in *Bilt-Rite Contractors v. The Architectural Studio*, 866 A.2d 270 (Pa. 2005) and *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840 (Pa. 2009) "do **not** stand for the proposition that the economic loss doctrine, as applied in Pennsylvania, precludes all negligence claims seeking solely

economic damages." *Dittman*, 196 A.3d at 1054 (emphasis added). Rather, the Supreme Court made clear that in Pennsylvania, courts are to apply a "reasoned approach" to applying the economic loss doctrine that "turns on the determination of the source of the duty plaintiff claims the defendant owed…if the duty arises under a contract between the parties a tort action will not lie from a breach of that duty to support a tort action." *Id*. (*citing Bilt-Rite*, 866 A.2d at 288). Ultimately, in *Dittman*, the Supreme Court found plaintiffs' claims that the defendant breached its common law duty to act with reasonable care in collecting and storing their personal and financial information on its computer systems "exist[ed] independently from any contractual obligations between the parties, the economic loss doctrine d[id] not bar [their] claims." 196 A.3d at 1056.

Here, just like *Dittman*, there is no contractual relationship between Plaintiff and NDS and NDS breached its common law duties in distributing defective check valves that failed resulting in damage. ¶24, n.1 (noting that "[p]laintiff did not purchase check valves directly from NDS" but rather from a Pennsylvania based entity, Lee Supply Co., Inc.). As such, without any contractual relationship, the economic loss doctrine does not bar either of Plaintiff's negligence or strict liability claims. *Amig v. County of Juniata*, 2020 WL 102998, at *6 (M.D. Pa. 2020) (rejecting economic loss arguments holding that "*Dittman* applies to both strict-products liability claims and negligence actions.").

Lastly, even if the economic loss doctrine could conceivably apply (it does not), Plaintiff has adequately pled that the check valve failures have caused damage to "other property." The FAC plainly alleges that as a result of the failures Plaintiff is now facing property damage claims from homeowners. ¶¶30, 44. NDS brushes these allegations aside by claiming that although "other property" was, in fact, damaged, it was not the Plaintiff's. But, NDS provides no legal authority to support that courts interpret "other property" as limited to that of the plaintiff.

The Third Circuit, in interpreting Pennsylvania law and relevant precedent from the United States Supreme Court, determined that for purposes of the economic loss doctrine that it is "the time of sale to the initial user as the critical point for determining whether added features are part of the product itself or other property." *2-J Corp. v. Tice*, 126 F.3d 539, 543 (3d Cir. 1997). Relying on Supreme Court precedent, the Third Circuit explained "'the product' is no more and no less than whatever the manufacturer placed in the stream of commerce by selling it to the initial user." *Id*. (*citing Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875 (1997)). As such, the Third Circuit reversed the district court's holding that the economic loss doctrine barred a warehouse owner from recovering for items stored in the warehouse that were damaged when the roofing material (the product at issue) failed. *See id*.

Likewise, the check valve is the "the product" and the damaged residential properties constitute "other property" for purposes of the economic loss doctrine. Even without the holding of *Dittman*, the doctrine would not apply to Plaintiff's claims. Defendant's motion should be denied.

### C. Plaintiff Has Standing to Pursue a UTPCPL Claim

NDS's argument that Plaintiff does not have standing to pursue a UTPCPL claim is based on an entirely false premise: Roamingwood is a public utility that used the check valves as part of its business. Def. MOL at 11, 13. The FAC makes clear that is not true. As such, and following the rational of what NDS concedes is the "leading case," Plaintiff, in its representative capacity, purchased the check valves for "personal, family or household use," and therefore, it has standing to pursue a claim under the UTPCPL. *Id.* at 10 (*citing Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641 (Pa. Super. 1990)).

### 1. UTPCPL's Statutory Framework

*First*, the UTPCPL applies broadly to trade or commerce which includes, "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value…" 73 P.S. § 201-2(3) (emphasis added). The statutory language gives "any person" who purchases goods and suffers a loss as a result of deceptive conduct the right to bring a claim. 73 P.S. §201-9.2(a). Contrary to NDS's arguments that the statute is limited to traditional consumer transactions

(Def. MOL at 9) the statute's definitions expressly defines "person" to include all "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." 73 P.S. §201-2(2). The General Assembly's intent was that the UTPCPL "be liberally interpreted, so as to benefit the public at large by eradicating, among other things, unfair or deceptive business practices." *Anadarko Petroleum Corporation v. Commonwealth*, 206 A.3d 51, 57 (Pa. Cmwlth. 2019) (finding that UTPCPL "covers business and commercial leases as well, not just those which involve consumers..."). "This underlying legislative intent weighs heavily against implying a restrictive requirement which would hinder the act's remedial effects, or provide a simple expedient for evasion of its force." *Valley Forge Towers South Condominium*, 574 A.2d at 641.

Next, applying these principles, the Pennsylvania Superior Court in *Valley Forge Towers* addressed a UTPCPL claim brought by an incorporated non-profit condominium association that entered into a contract with the defendant to install a roof on the condominium building. *Id.* at 642. After two years, the roof began to leak, and after several unsuccessful attempts to repair it, the association replaced the roof at considerable cost. *Id.* The association sued the defendant for, *inter alia*, a violation of the UTPCLP. *Id.* The defendant moved to dismiss on the grounds that the association was not a "person" who "purchased" a roof "primarily for

16

personal, family or household use" within the meaning of the UTPCPL. *Id*. The trial court agreed and dismissed the UTPCPL claim; the Superior Court reversed.

The Superior Court first concluded that, as an "association," it fell "squarely within the express definition of the term 'person' as used in 73 P.S. §201-9.2" *Id*. at 645. Next, with respect to the "personal, family, or household use" requirement the defendant argued that the roofing materials were not "typical 'consumer products'" and the association was "in the business of managing the condominium, and so was not a purchaser for personal, family, or household use." *Id*. at 647. The Superior Court rejected both contentions.

In rejecting the "consumer product" or "type of product" rational, the Superior Court gave examples of where a business can and would purchase a consumer product for use in their business and consumers can and would purchase goods from business suppliers for household use (*e.g.,* a family of 12 purchases industrial washer and dryer used primarily for business for household use). *Id*. at 648. Simply, this type of analysis is unworkable and not recognized for purposes of the UTPCPL. *See id.*

The Court then found that the association purchased the roof materials for "personal, family or household use" because the association acts in a representative capacity of the building's individual owners and the roof was placed on a building used by those owners "*primarily…* for personal, family, or household *residential*

unit owners and/or their lessees." *Id.* (emphasis in original). The Court noted that "a leak-proof roof is ultimately essential to the structural integrity of the whole condominium building, it is the primary (preponderate) purpose (use) of the whole building…" *Id.* at 649.

## 2. Roamingwood's Purchase of the Check Valves Were for Personal, Family or Household Use

As set forth in the FAC and the attached Roamingwood by-laws, just like in *Valley Forge Towers*, Plaintiff is a non-for-profit, cooperative association which fits squarely into the definition of a "person" for purposes of the UTPCPL. 73 P.S. § 201-2(2).

Second, NDS makes the argument that the check valves are a "product…used in by [sic] a business in a public utility application." Def. MOL at 11. As already discussed, the Superior Court expressly rejected any sort of "consumer product" or "type of product" test for satisfying the UTPCPL standing requirements. *Valley Forge Towers South Condominium*, 574 A.2d at 648. NDS does not point this Court to any subsequent authority that establishes that a different court employed or accepted such an analysis. Def. MOL 9-11. For good reason, as demonstrated by the allegations in the FAC, check valves can be, and have been, used in household settings as part of a swimming pool. ¶32.

Lastly, while NDS references the FAC's additional allegations about its status as an association who acts solely for the benefit of its members, it does

nothing to distinguish the on-point facts and rational of *Valley Forge Towers* other than to claim "the product at issue is not one for primarily for personal, family or household use" and that Plaintiff is a "business" that was "not acting in a representative capacity." Def. MOL 12.

But these conclusory statements are at total odds with the facts in the FAC (which must be accepted as true). As pled, Plaintiff is non-profit cooperative association that operates exclusively for the benefit of its members; the owners of residential property in a private community. ¶10 Roamingwood is *not* a public utility as NDS claims; its sole purpose is to supply water and sewer service exclusively to its members at reasonable rates—no one else. ¶11. When Plaintiff purchased NDS's check valves it did so at the direction of its Board of Directors, who themselves are community members empowered by Plaintiff's by-laws to enter into contracts on behalf of the members. ¶12. And, just as the roof in *Valley Forge Towers* that was deemed to be essential to the structural integrity of the whole condominium building, the ability to remove raw sewage from the residential properties and into a sewage treatment system is essential for the use of the residential property.

Plaintiff is a "person" who "purchased" check valves primarily for "personal, family or household use." NDS's motion to dismiss should be denied.[5]

### D. Plaintiff's Damages are not Speculative

There is nothing speculative about Plaintiff's damages for the defective check valves that remain installed and must be replaced, otherwise Plaintiff faces the threat of continued property damage claims and environmental contamination. Plaintiff relied on NDS's representation that the check valves would withstand pressures up to 200 psi. ¶¶28, 77. After 22 identical failures it is clear that representation was false, and Plaintiff is entitled to be returned to its original position. *Boehm*, 117 A.3d at 331 ("The trial court reasoned that the plaintiffs were entitled to restitution [under the UTPCPL] to return them to their previous position); *see also Richards v. Ameriprise Financial, Inc.*, 217 A.3d 854, 865 (Pa. Super. 2019) ("The UTPCPL reflects the legislature's intent to empower ... trial judges with broad remedial authority ... to undo the harm that vendors cause when they break the UTPCPL.") (internal quotations and citations omitted).

---

[5] NDS suggests in footnote 1 of its brief that an alternative basis for dismissing Plaintiff's UTPCPL claim is the economic loss doctrine. Def. MOL at 13, n.1. Courts in this district recognized that earlier Pennsylvania precedent precluding UTPCPL claims on the grounds of economic loss have been abrogated. *Silva*, 416 F.Supp.3d at 402 (in refusing to apply economic loss to bar a UTPCPL claim the court recognized that "Pennsylvania state court jurisprudence on the economic loss doctrine has changed significantly…the Pennsylvania Superior Court has twice concluded that UTPCPL claims are not barred by the economic loss doctrine.") (citations omitted).

Indeed, the very authority NDS relies on to support its "speculative damages" argument the Third Circuit reversed the district court's decision to dismiss the alleged speculative damages. Def. MOL at 14 (*citing Blanche Road Corp. v. Bensalem Twp.*, 57 F.3d 253 (3d Cir. 1995)). In *Blanche Road*, the Plaintiffs brought a civil rights claim against township authorities for intentionally interfering with their ability to acquire and develop certain land. *Blanche Road Corp.*, 57 F.3d at 266. The district court dismissed the plaintiff's request for damages related to properties that the plaintiff had not yet exercised its purchase rights and no permits had been sought to develop those properties. *Id*. The Third Circuit reversed finding that the district court erred in "precluding plaintiffs from pursuing their claim for recovery damages resulting from their alleged inability to develop lots they never purchased." *Id*.

Here, the damages are far less attenuated than in *Blanche Road Corp.* Plaintiff has concrete evidence that the check valves are defective and cannot withstand the minimal pressures of Plaintiff's system. Plaintiff would not have otherwise purchased or installed these check valves had they known about their defective condition. Plaintiff should be returned to its original position. There is nothing speculative about these damages. NDS's motion should be denied.

## V. CONCLUSION

Plaintiff respectfully requests that the Court deny Defendant's Motion to Strike Pursuant to Rule 12(f) and Motion to Dismiss for Failure to State a Claim Counts I, II, & IV pursuant to Rule 12(b)(6).

Date: June 2, 2020                    Respectfully submitted,

By:  ____*s/Patrick Howard*____
     Larry Bendesky, Esquire
     Simon B. Paris, Esquire
     Patrick Howard, Esquire
     Charles J. Kocher, Esquire
     **SALTZ, MONGELUZZI &**
     **BENDESKY, P.C.**
     One Liberty Place, 52nd Floor
     1650 Market Street
     Philadelphia, PA 19103
     Tel:(215) 575-3895
     Email:  LBendesky@smbb.com
            SParis@smbb.com
            PHoward@smbb.com
            CKocher@smbb.com

     *Counsel for Plaintiff*

**CERTIFICATE OF WORD COUNT**

I certify that, in accordance with L. Civ. R. 7.8(b)(2), the attached brief (without cover page, table of contents and authorities, and signature block) contains 4,964 words pursuant to the word-count feature utilized in Microsoft Word, which is less than the 5,000 word limit.

**CERTIFICATE OF SERVICE**

I certify that on June 2, 2020, I caused the attached document to be filed with the Court's ECF system such that all counsel of record will be served automatically.

*s/ Patrick Howard*