## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ROAMINGWOOD SEWER & WATER :    Civil No. 1:20-CV-00640
ASSOCIATION,                 :

                 :

         Plaintiff,          :

                 :

         v.                :

                 :

NATIONAL DIVERSIFIED SALES,    :
INC.,                  :

                 :

         Defendant.        :    Judge Jennifer P. Wilson

## <u>MEMORANDUM</u>

Before the court is Defendant's motion to dismiss and to strike pursuant to

Rules 12(b)(6) and 12(f) of the Federal Rules of Civil Procedure.  (Doc. 11.)  This

action was brought by Plaintiff, Roamingwood Sewer & Water Association

("Roamingwood"), to recover damages for, *inter alia*, the allegedly defective

check valves manufactured by Defendant, National Diversified Sales, Inc.

("NDS"), which were installed by Roamingwood as part of a complete sewer

system renovation within The Hideout, a residential housing community in the

Poconos.  (Doc. 1, pp. 1–3.)[1]  NDS has moved to dismiss three of the four counts

in Roamingwood's complaint, including claims for strict liability, negligence, and

violations of Pennsylvania's Unfair Trade Practices and Consumer Protection Law

---

[1] For ease of reference, the court utilizes the page number from the CM/ECF header.

("UTPCPL").[2]  (Doc. 11.)  The court finds that Roamingwood's claims for strict liability and negligence are not barred by the application of Pennsylvania's economic loss doctrine; Roamingwood's UTPCPL claim is neither barred by the language of the UTPCPL nor by the economic loss doctrine; there is a reasonable basis for Roamingwood's damages claim for replacement of the remaining check valves; and paragraphs 14 and 32 of the complaint are not immaterial, impertinent, or scandalous.  The court will therefore deny the motion to dismiss and to strike in its entirety.  (Doc. 11.)

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

According to its complaint, Roamingwood is a non-profit association tasked with operating the water and sewer system exclusively for the benefit of its members, who are property owners within The Hideout.  (Doc. 1, p. 1.)  Homes within The Hideout are predominantly used as summer vacation retreats.  (*Id.* at 6.)  As originally constructed in the early 1970's, The Hideout utilized a gravity sewer system whereby wastewater flows downhill to a collection area.  (*Id.* at 5−6.)  In 2013, Roamingwood, with the authorization of its Board of Directors, decided to completely replace the existing gravity sewer system with a low-pressure sewer system—a $97 million project to be completed in three stages.  (*Id.* at 6−7.)

[2] The remaining count, not subject to NDS's motion to dismiss, is for breach of the implied warranties of merchantability and fitness for a particular purpose.

Low-pressure sewer systems function by grinding solid waste into a slurry that can be transported to a collection area regardless of land grading or groundwater depth.  (*Id.* at 6.)  According to Roamingwood, a key component of this system is the check valve which "connect[s] a home's lateral sewer line to the community sewer line underground."  (*Id.* at 7.)  A check valve contains an internal flapper that allows sewage to flow out of the home through the lateral sewer, and then closes to prevent sewage from reentering the home's lateral sewer. (*Id.*)  Roamingwood alleges that if the flapper on the check valve malfunctions, sewage can flow backwards into the lateral sewer, which can cause sewage to back up into the home or cause the lateral sewer line to explode underground.  (*Id.*) Thus, Roamingwood asserts that the functionality of the check valve is critical to the success of the low-pressure sewer system.  (*Id.*)

In the first two stages of construction, Roamingwood asserts that it used check valves manufactured by King Brothers Industries ("KBI").  (*Id.*)  At some point before beginning stage three of the project, Roamingwood claims that KBI's business was bought out by NDS.  (*Id.*)  Roamingwood alleges that NDS then changed the design or manufacturing process for KBI's check valves destined for stage three of the project to make them less durable than KBI's original design. (*Id.* at 7–9.)  Roamingwood also alleges that it did not purchase check valves directly from NDS; rather, they were purchased as part of an assembly from Lee

Supply Co., Inc., which had purchased them from The Lateral Connection Corporation.  (*Id.* at 7–8.)

NDS's stage-three check valves consist of two plastic pieces welded together on either side of a rubber gasket, which is depicted in the complaint.  (*Id.* at 8.)  NDS allegedly represented that these redesigned check valves could withstand up to 200 pounds per square inch ("psi") of working pressure.  (*Id.* at 10.)  Roamingwood claims that its sewer system only produced a maximum of 67 psi, and that therefore, the redesigned check valves should have been able to withstand the maximum pressure of Roamingwood's sewer system.  (*Id.*)  Between 2017 and 2019, NDS's redesigned check valves were allegedly installed in 800 stage-three properties.  (*Id.*)

Despite NDS's representations regarding the durability of these check valves, Roamingwood alleges that "between May 27, 2018 and February 12, 2020, 22 NDS check valves failed in identical fashion causing environmental contamination due to the release of raw sewage and damage to property" which required Roamingwood to dig up, remove, and replace the failed check valves. (*Id.*)  Roamingwood asserts that homeowners affected by defective check valves have brought suit against it for property damage.  (*Id.* (citing *Schaub v. Roamingwood Sewer*, No. 532-cv-2019 (Wayne Cty.).)  Based on the allegedly uniform nature of the check valve failure, Roamingwood claims that additional

failures are likely, and that replacement of all 800 NDS check valves is the prudent approach to avoid future litigation.  (*Id.* at 10, 13.)

Roamingwood asserts that NDS was on notice of its defective flapper design before the stage-three check valves were installed since, in 2016, NDS was subject to a judgment for a check valve failure installed in a residential swimming pool. (*Id.* at 11 (citing *Postil v. National Diversified Sales, Inc., et al.*, No. C20151812, 2016 WL 5243139 (Ariz. Ct. App. July 29, 2016) (verdict, agreement, and settlement).)  In addition, in December 2018, after discovering the defect, Roamingwood claims that it also notified NDS of the check valve failures.  (*Id.*) Roamingwood alleges that on January 29, 2020, the parties engaged Micron, Inc. to conduct a visual and microscopic inspection of 10 failed check valves.  (*Id.*) This inspection purportedly revealed that the:

> weld intended to hold the two white plastic pieces together was incomplete.  As a result, during routine use, the white plastic's bond would fail, cause the white plastic parts to separate, and consequently cause the flapper to fail.  Once the rubber gasket lost the weight of the plastic, sewage could easily slide back down the lateral into the property.

(*Id.* at 12.)  Roamingwood alleges that NDS no longer manufactures the check valves installed in stage three of Roamingwood's project.  (*Id.* at 11.)

On the basis of these facts, Roamingwood filed a complaint on April 17, 2020.  (Doc. 1.)  Roamingwood amended its complaint on May 12, 2020, alleging claims for strict liability, breach of the implied warranties of merchantability and

5

fitness for a particular purpose, negligence, and damages under Pennsylvania's UTPCPL. (Doc. 9.) On May 19, 2020, NDS filed the instant motion to dismiss, asserting, *inter alia*, that Roamingwood's claims for strict liability, negligence, and violation of the UTPCPL fail as a matter of law. (Doc. 11.) On June 2, 2020, Roamingwood filed its brief in opposition. (Doc. 14.) NDS timely filed a reply brief. (Doc. 15.) Thus, this motion is ripe for review.

## JURISDICTION

The court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as the parties have complete diversity and the amount in controversy exceeds $75,000. Further, venue is appropriate because the action detailed in the complaint occurred in the Middle District of Pennsylvania.

## STANDARD OF REVIEW

### A. Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Conclusory allegations of liability are insufficient" to

survive a motion to dismiss.  *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678−79).  To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief."  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

### B.  Motion to Strike Under Federal Rule of Civil Procedure 12(f)

Under Federal Rule of Civil Procedure 12(f), a party can move a district court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  This rule is "designed to reinforce the requirement in Rule 8 . . . that pleadings be simple, concise, and direct."  5C CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1380 (3d ed. 2020 update).  To that end, the purpose of any motion to strike should be to "clean up the pleadings, streamline litigation, and avoid the unnecessary forays into immaterial matters."  *United States v. Educ. Mgmt. Corp.*, 871 F. Supp. 2d 433, 460 (W.D. Pa. 2012) (citation omitted).

Motions to strike should not be used to persuade a court to determine disputed questions of law.  *See Tonka Corp. v. Rose Art Indus., Inc.*, 836 F. Supp. 200, 218 (D.N.J. 1993) (citations omitted).  They also "may not serve as an avenue

to procure the dismissal of all or part of a complaint." *Davila v. N. Reg'l Joint Police Bd.*, 979 F. Supp. 2d 612, 624 (W.D. Pa. Oct. 21, 2013), *vacated in part on reconsideration*, 2014 U.S. Dist. LEXIS 102143 (July 28, 2014) (citing *Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, 901 F. Supp. 2d 509, 530–31 (D.N.J. 2012)).

The burden rests with the moving party to show that the challenged matter should be stricken. *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 496 (W.D. Pa. 2019). Thus, the movant must demonstrate that the matter falls within one of the categories listed in Rule 12(f). "Immaterial" matter is that which "has no essential or important relationship to [any] claim[s] for relief." *Wagner v. Holtzapple*, 101 F. Supp. 3d 462, 488 (M.D. Pa. 2015) (citing *Del. Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279 (D. Del. 1995)). "Impertinent" matter consists of "statements that do not pertain, and are not necessary, to the issues in question." *Id.* (citation omitted). And "scandalous" matter is that which "casts a derogatory light on someone, uses repulsive language, or detracts from the dignity of the court." *Id.* (citing *Carone v. Whalen*, 121 F.R.D. 231, 232 (M.D. Pa. 1988)).

## DISCUSSION

In this case, NDS argues that portions of Roamingwood's complaint should be dismissed as follows: (1) Roamingwood's claims for strict liability and negligence should be dismissed as barred by Pennsylvania's economic loss

doctrine; (2) Roamingwood's claims under the UTPCPL should be dismissed since the UTPCPL is inapplicable to this case and because these claims are otherwise barred by the Pennsylvania economic loss doctrine; (3) if the court dismisses the UTPCPL claims, the court should also dismiss Roamingwood's claims for treble damages and attorneys' fees since these are only recoverable under a viable UTPCPL claim; and (4) Roamingwood's claims for replacement of the remaining check valves should be dismissed as seeking recovery for speculative harm.  (Doc. 11.)  NDS also argues that paragraphs 14 and 32 of the complaint should be stricken as immaterial, impertinent, and scandalous.  (*Id.*)  The court will address these arguments in turn below.

### A. Roamingwood's Claims for Strict Liability and Negligence will not be Dismissed.

NDS argues that Roamingwood's state law tort claims for strict liability and negligence are economic losses unaccompanied by physical injury or property damage which are barred as a matter of law by Pennsylvania's economic loss doctrine.  (Doc. 12, p. 5.)  Specifically, NDS asserts that the contractual relationship between the parties, whereby Roamingwood purchased allegedly defective check valves manufactured by NDS, gives rise to claims under contract law, rather than tort law.  (*Id.* at 8.)  In contrast, Roamingwood claims that there was no contract formed between the parties because Roamingwood purchased the

allegedly defective valves from a third-party, rather than from NDS directly.[3]

(Doc. 14, p. 17.)  Therefore, Roamingwood argues that the economic loss doctrine

cannot serve as a bar to its tort law claims.

Pennsylvania's economic loss doctrine has evolved in recent years.  As the

Middle District of Pennsylvania explained:

> Traditionally, Pennsylvania's economic loss doctrine "developed in the
> product liability context to prevent tort recovery where the only injury
> was to the product itself."  *Sarsfield v. CitiMortgage, Inc.*, 707 F. Supp.
> 2d 546, 556 (M.D. Pa. 2010).  Eventually, the doctrine came to stand
> for the proposition that, "no cause of action can be maintained in tort
> for negligence or strict liability where the only injury was 'economic
> loss'—that is, loss that is neither physical injury nor damage to tangible
> property."  *2-J Corp. v. Tice*, 126 F.3d 539, 541 (3d Cir. 1997) (citing
> *Aikens v. Baltimore & O. R. Co.*, 501 A.2d 277, 279 (Pa. Super. 1985)).
>
> Recently, however, in *Dittman v. UPMC*, 196 A.3d 1036 (Pa. 2018),
> the Pennsylvania Supreme Court limited the doctrine's application and
> moved away from an analysis of whether plaintiff alleges solely
> economic harms.  Instead, the Pennsylvania Supreme Court shifted to
> an examination of what kinds of remedies are available to the plaintiff.
> Under the new *Dittman* test, the economic loss doctrine bars a
> plaintiff's solely economic claim via a tort action if the breached duty
> arises under a contract.  *Id.* at 1054.  ("[I]f the duty [that the tortfeasor
> breached] arises under a contract between the parties, a tort action will
> not lie from a breach of that duty.  However, if the duty arises
> independently of any contractual duties between the parties, then a
> breach of that duty may support a tort action.").  "Thus, *Dittman*
> rejected the 'general pronouncement' that 'all negligence claims for
> economic losses are barred under Pennsylvania law . . . .' [and] held
> that 'under Pennsylvania's economic loss doctrine, recovery for purely
> pecuniary damages is permissible under a negligence theory provided
> that the plaintiff can establish the defendant's breach of a legal duty

---

[3] The court notes that NDS does not respond to Roamingwood's assertion that no contract was
formed between the parties for the purchase of the allegedly faulty check valves.

arising under common law that is independent of any duty assumed pursuant to contract.'"  *Dalgic v. Misericordia Univ.*, No. 3:16-CV-0443, 2019 WL 2867236, *26 (M.D. Pa. July 3, 2019).

*Amig v. Cty. of Juniata*, 432 F. Supp. 3d 481, 488 (M.D. Pa. 2020) (footnote omitted).  Thus, the focus of the doctrine under Pennsylvania law has become the source of the party's duty; specifically, whether such duty arises under contract or tort law.  Therefore, "if a plaintiff has contractual remedies for her solely economic harms, she must seek those remedies in contract, not tort."  *Id.*

It follows that where there is no contractual relationship between the parties, an aggrieved party cannot seek a contract remedy.  To this end, courts in this Circuit have held that where there is no contract between the parties, the economic loss doctrine is inapplicable and does not bar the plaintiff from pursuing a tort action.  *See, e.g.*, *Svigals v. Lourdes Imaging Assocs., P.A.*, No. 18-1736, 2018 U.S. Dist. LEXIS 200251, at *9 (D.N.J. Nov. 27, 2018) (finding that "[t]he purpose of [New Jersey's] economic loss doctrine, in part, is to prohibit plaintiffs from using tort law to alter contractual remedies or to replace a breach of contract action[, which] is not implicated where parties are not in contractual privity.") (citing *SRC Constr. Corp. v. Atl. City Hous. Auth.*, 935 F. Supp. 2d 796, 799–800 (D.N.J. 2013)); *G&F Graphic Servs. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 589 n.6 (D.N.J. 2014) (holding that the economic loss doctrine did not apply where there was no contract between the parties); *Capricorn Power Co. v. Siemens*

11

*Westinghouse Power Corp.*, 324 F. Supp. 2d 731, 742 (W.D. Pa. 2004) ("[W]here no contract was formed to provide a remedy for the damages being claimed in a tort action, there is no corresponding need to apply the economic loss doctrine to prevent the contract remedies from being superseded by tort remedies.").[4]

In this case, it is clear from the face of the complaint and the parties' briefs that there is a dispute regarding whether a contractual relationship was formed for the purchase of the check valves at issue.  (*See* Doc. 9, p. 7 n.1; Doc. 12, p. 8; Doc. 14, p. 17.)  Roamingwood asserts that it obtained the allegedly defective check valves as "part of an assembly purchased from Lee Supply Co., Inc.," which had in turn purchased them from The Lateral Connection Corporation.  (Doc. 9, pp. 7–8.) Viewing the complaint in the light most favorable to Roamingwood, the court finds that there is a substantial question regarding whether a contractual relationship was formed between the parties.  Unless and until it is determined that a contractual relationship exists between the parties, the court will not apply the economic loss doctrine to dismiss Roamingwood's claims for strict liability and negligence.[5]

---

[4] Like Pennsylvania's economic loss doctrine, New Jersey's economic loss doctrine "'prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract.'"  *Cofund II, LLC v. Hitachi Capital Am. Corp.*, No. 16-cv-1790, 2019 U.S. Dist. LEXIS 201194, at *12 n.9 (D.N.J. Nov. 20, 2019) (quoting *Turbulent Diffusion Tech. Inc. v. Amec Foster Wheeler N. Am. Corp.*, No. 15-7105, 2017 WL 1752951, at *2 (D.N.J. May 4, 2017)).

[5] Roamingwood also raises alternative arguments for why the economic loss doctrine should not bar its claims for strict liability and negligence.  However, in light of the court's conclusion that

12

**B. Roamingwood's Claims Under the UTPCPL will not be Dismissed.**

NDS argues that Roamingwood's claims under the UTPCPL should be dismissed because the UTPCPL only allows a claimant to recover damages if the goods or services purchased were "primarily for personal, family or household purposes." (Doc. 12, p. 9.) Because Roamingwood purchased the valves at issue for use in a utility application, NDS claims that the UTPCPL is unavailable as an avenue for Roamingwood to pursue damages. (*Id.*) NDS also asserts that Roamingwood's UTPCPL claim is barred by Pennsylvania's economic loss doctrine. (*Id.* at 13.) Roamingwood counters that it purchased the check valves in a representative capacity on behalf of its members, the homeowners in The Hideout, and therefore purchased the valves for its members' personal, family, or household use. (Doc. 14, p. 19.) NDS rejoins that Roamingwood's by-laws, attached to its complaint, indicate that Roamingwood serves as an agent for the public utility, rather than the residents of The Hideout, since one of its purposes is "[t]o lease the two utilities to the South Wayne County Water and Sewer Authority established by the County Commissioners of Wayne County, which authority would in turn enter into an Agreement with this Corporation to operate and manage the two utilities." (Doc. 15, p. 14.) Therefore, NDS posits that Roamingwood

the lack of contractual relationship between these parties precludes the application of the economic loss doctrine, the court does not address these additional arguments.

cannot bring a claim for damages under the UTPCPL.  These arguments are addressed seriatim.

### 1. The Check Valves at Issue Were Purchased on Behalf of Roamingwood's Members Primarily for Personal, Family, or Household Purposes.

Pennsylvania's UTPCPL is a remedial statute, enacted primarily as a fraud prevention mechanism, and, as such, is entitled to liberal construction.  *Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641, 644 (Pa. Super. Ct. 1990).  The UTPCPL, in pertinent part, authorizes certain persons to bring suit for damages if they have purchased "goods or services primarily for personal, family or household purposes" which caused them to suffer "an ascertainable loss as the result of an 'unfair or deceptive act[.]'" *Id.* at 644–45 (quoting 73 PA. CONS. STAT. § 201-9.2(a)).  A "person" is defined by the UTPCPL to include, *inter alia*, incorporated or unincorporated associations.  *Id.* at 645 (quoting 73 PA. CONS. STAT. § 201-2).  When determining whether a good is used "primarily for personal, family or household purposes," courts looks to the purpose of the purchase, rather than the type of product purchased.  *Id.* at 648.  In other words, products "not commonly characterized as 'consumer products,'" such as bricks, mortar, or roofing materials, may still be "purchased 'primarily for a personal, family, or household use,' i.e., as a necessary part of a personal, family, or household residence." *Id.*  As explained by the Pennsylvania Superior Court,

> In previous cases, the purchase or lease of a home, condominium, or apartment for residential purposes has been implicitly treated as being "primarily for personal, family, or household purposes" under the Pa.U.T.P.C.P.L.. We can see no reason why, if a purchase or lease of the whole residential unit comes within the act, a contract regarding part of the unit (i.e. its roof) would not also be covered by the act.

*Id.* (citations omitted).

In this case, the complaint defines Roamingwood as a non-profit association organized under the Nonprofit Corporation Law of 1972, 15 PA. CONS. STAT. §§ 7301, *et seq.*, operating exclusively for the benefit of its members. (Doc. 1, p. 1.) As an association organized under the laws of Pennsylvania, Roamingwood fits "squarely within the express definition of the term 'person' as used in 73 P.S. § 201-9.2."[6] *Valley Forge Towers South Condominium*, 574 A.2d at 645.

In addition, the court finds that while check valves are not typically characterized as consumer products, they are a necessary part of a household residence. This is evidenced by the important role they play in preventing sewage backups into the home's lateral sewer. In other words, check valves are part and parcel of the residential unit. Roamingwood asserts that it purchased the stage

---

[6] The court notes that even in the absence of express legislative authorization for an incorporated association like Roamingwood to sue in a representative capacity on behalf of its members, representative standing would nonetheless likely be recognized generally under Pennsylvania law. *Robinson Twp. v. Commonwealth*, 83 A.3d 901, 922 (Pa. 2013) ("Under Pennsylvania law, an association has standing as representative of its members to bring a cause of action even in the absence of injury to itself, if the association alleges that at least one of its members is suffering immediate or threatened injury as a result of the action challenged.") (citing *Pennsylvania Med. Soc'y v. Dep't of Pub. Welfare*, 39 A.3d 267, 278 (Pa. 2012); *accord South Whitehall Twp. Police Serv. v. South Whitehall Twp.*, 555 A.2d 793 (Pa. 1989)).

three check valves for the benefit of its members' households.  Given the liberal construction that UTPCPL claims are entitled to receive under Pennsylvania law, and reading the complaint in the light most favorable to Roamingwood, the court finds that Roamingwood qualifies as a purchaser under the UTPCPL that purchased check valves on behalf of its members primarily for household use.  Therefore, NDS's motion to dismiss these claims will be denied.[7]

### 2. Roamingwood's UTPCPL Claims are not Barred by Pennsylvania's Economic Loss Doctrine.

NDS argues that Roamingwood's UTPCPL claim should be dismissed pursuant to the economic loss doctrine.  In so arguing, NDS relies largely on the Third Circuit's holding in *Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3d Cir. 2002).  In *Werwinski*, the Third Circuit was called upon to predict how the Pennsylvania Supreme Court would rule regarding whether the economic loss doctrine bars claims brought under the UTPCPL.[8]  *Id.* at 678, 681.  The Third Circuit concluded that the Pennsylvania Supreme Court would determine that the economic loss doctrine would bar claims brought under the UTPCPL.  *Id.*  Without

---

[7] The court notes that NDS's argument that Roamingwood serves as an agent for the public utility is one better suited for a motion for summary judgment.  Analysis of this argument requires more factual development regarding the nature of Roamingwood's duties with respect to its members and the public utility, and it cannot be determined based on the complaint alone.  Thus, the court declines to grant NDS's motion to dismiss on this ground without prejudice to renewal on a timely motion for summary judgment.

[8] The court notes that the Pennsylvania Supreme Court has yet to take up this issue.

16

an intervening decision from the Third Circuit or a Pennsylvania appellate court, *Werwinski* would control, and Roamingwood's UTPCPL claims would be barred by the economic loss doctrine.  However, since the Third Circuit's ruling in *Werwinski*, the Pennsylvania Superior Court has issued two cases holding that UTPCPL claims are not barred by the economic loss doctrine, neither of which appears to have been appealed to the Pennsylvania Supreme Court.  *See Dixon v. Northwestern Mutual*, 146 A.3d 780, 790 (Pa. Super. Ct. 2016) (holding that plaintiff's UTPCPL claim was not barred by the economic loss doctrine); *Knight v. Springfield Hyundai*, 81 A.3d 940, 952 (Pa. Super. Ct. 2013) (holding that the economic loss doctrine was inapplicable and did not operate as a bar to the plaintiff's UTPCPL claims).  Thus, the court recognizes that there is a conflict between existing Third Circuit and Pennsylvania Superior Court precedent.

The district courts in this circuit are likewise conflicted with respect to whether the *Werwinski* ruling or the Superior Court rulings in *Knight* and *Dixon* are controlling.  *Kerr v. State Farm Mut. Auto. Ins. Co.*, No. 18-309, 2018 U.S. Dist. LEXIS 189502, at *10 (W.D. Pa. Nov. 6, 2018) (collecting cases).  While the court is aware that it is generally bound by Third Circuit precedent, there are well-established exceptions to this general rule, one of which is implicated where there is "persuasive evidence of a change in Pennsylvania law[.]"  *Debiec v. Cabot Corp.*, 352 F.3d 117, 131 (3d Cir. 2003); *Robinson v. Jiffy Executive Limousine*

17

*Co.*, 4 F.3d 237, 239–40 (3d Cir. 1993) ("[W]hen we are applying state law and there is persuasive evidence that it has undergone a change, we are not bound by our previous panel decision if it reflected our reliance on state law prior to its modification."). The court is also aware that while "state intermediate appellate decisions are not automatically controlling where the highest court of the state has not spoken," the court "must give serious consideration to the decisions of the intermediate appellate courts in ascertaining and applying state law." *Id.* at 242.

In this case, the court finds that deference to the Pennsylvania Superior Court's decisions in *Dixon* and *Knight* is appropriate. As previously noted, the *Werwinski* court was required to predict how the Pennsylvania Supreme Court would rule regarding whether the economic loss doctrine bars claims brought under the UTPCPL without the benefit of <u>any</u> relevant precedent from Pennsylvania appellate courts. As a federal court exercising diversity jurisdiction in this case, we are bound to apply relevant Pennsylvania law, not what the Third Circuit predicted Pennsylvania law would be at a time the Circuit was writing on a blank slate because the state of the law was uncertain. *Erie R.R. Co. v. Tompkins*, 304 U.S 64, 78 (1938); *Chamberlain v. Giampapa*, 210 F.3d 154, 158 (3d Cir. 2000).

As it stands, the Pennsylvania Superior Court has indicated that UTPCPL claims are <u>not</u> barred by the economic loss doctrine. *See Dixon*, 146 A.3d at 790;

*Knight*, 81 A.3d at 952.  Thus, the court finds that under Pennsylvania law, the

economic loss doctrine does not bar UTPCPL claims.  The court will therefore

deny NDS's motion to dismiss Roamingwood's UTPCPL claims on economic loss

doctrine grounds.[9]

### C. Roamingwood's Claims for Replacement Check Valves are not Speculative.

NDS moves to dismiss Roamingwood's damages claims for replacement of

the remaining stage-three check valves as speculative, contingent, and conjectural

because not all of these valves have failed.  (Doc. 12, pp. 14–15.)  Roamingwood

counters that 22 stage-three check valves have failed as a result of the same defect,

causing property damage and environmental contamination.  (Doc. 14, p. 24.)

Thus, Roamingwood asserts that it is probable that more check valves will fail in a

similar fashion and subject Roamingwood to further liability.  (*Id.*)

Under Pennsylvania law, a plaintiff may not recover damages that are

"speculative, vague or contingent."  *UPMC v. CBIZ, Inc.*, 436 F. Supp. 3d 822, 835

(W.D. Pa. 2020) (quoting *Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861, 866 (Pa.

1988)).  "Damages are speculative if the uncertainty concerns the fact of damages

not the amount."  *Carroll v. Phila. Hous. Auth.*, 650 A.2d 1097, 1100 (Pa.

---

[9] Given the court's conclusion that Roamingwood's UTPCPL claims will not be dismissed at this stage, NDS's motion to dismiss Roamingwood's claims for treble damages and attorneys' fees under the UTPCPL will likewise be denied.

Commw. Ct. 1994). However, it is well established that a plaintiff need not

demonstrate damages to a "mathematical certainty, but only reasonable certainty,

and evidence of damages may consist of probabilities and inferences." *Molag, Inc.*

*v. Climax Molybdenum Co.*, 637 A.2d 322, 324 (Pa. Super. Ct. 1994) (quoting

*Delahanty v. First Pennsylvania Bank, N.A.*, 464 A.2d 1243, 1257–58 (Pa. Super.

Ct. 1983)) (quotation marks omitted). At base, a "plaintiff must show a

'reasonable basis' for the amount of damages claimed." *UPMC*, 436 F. Supp. 3d

at 835 (quoting *Rizzo v. Haines*, 555 A.2d 58, 68 (Pa. 1989)).

In this stage of the case, the court finds that Roamingwood has shown a

reasonable basis for its damages claim with respect to the cost of replacement for

the remaining stage-three check valves. To date, 22 of these valves have failed in

identical fashion, and the results of the parties' joint inspection at Micron, Inc.

revealed that the cause of the failure was that the:

> weld intended to hold the two white plastic pieces together was
> incomplete. As a result, during routine use, the white plastic's bond
> would fail, cause the white plastic parts to separate, and consequently
> cause the flapper to fail. Once the rubber gasket lost the weight of the
> plastic, sewage could easily slide back down the lateral into the
> property.

(Doc. 9, p. 12.) It is premature for the court to determine whether all of the stage-

three check valves suffer from this same manufacturing defect which would cause

them to eventually fail from routine use. However, based on Micron, Inc.'s report,

there is a reasonable basis to conclude that Roamingwood could sustain its

20

damages claim after further discovery.  Thus, the court will deny NDS's motion to dismiss Roamingwood's claim for damages for replacement of the remaining stage-three check valves without prejudice to renewal on a timely summary judgment motion.

### D. Paragraphs 14 and 32 of the Complaint will not be Stricken.

Finally, NDS moves to strike portions of paragraphs 14 and 32 of the amended complaint, asserting that these paragraphs are immaterial, impertinent, and scandalous.  (Doc. 11, pp. 4−5.)  Specifically, NDS moves to strike the purchase price from paragraph 14 for which the NORMA Group acquired NDS, and the entirety of paragraph 32 as irrelevant litigation in an unrelated, and therefore immaterial, case.  (Doc. 12, p. 4.)

#### 1.  Paragraph 14 will not be Stricken.

NDS argues that the inclusion of the purchase price is unduly prejudicial and impertinent, given its remote date of sale in 2014.  (Doc. 15, p. 3.)  Roamingwood counters that paragraph 14 contains pertinent information regarding NDS's financial resources that the court may consider when determining whether treble damages are appropriate for its UTPCPL claims.  (Doc. 9, pp. 13−14.)[10]  Paragraph 14 of the amended complaint asserts that:

---

[10] In addition, Roamingwood asserts that it lacks information regarding the parent-subsidiary relationship between NDS and the NORMA Group and "what role, if any, NORMA played in the check valves design change."  (Doc. 9, p. 14.)  The court notes that NDS only seeks to strike

>NDS is a subsidiary of the NORMA Group SE, which acquired NDS in October 2014 for $285 million.  The NORMA Group is a German-based company that manufactures a wide range of innovative joining technology solutions in three product categories (clamp, connect and fluid) and offers more than 30,000 products and solutions to around 10,000 customers in 100 countries.

(Doc. 9, p. 5.)

The court recognizes that the overall value of NDS, as apparently perceived by the NORMA Group at the time of purchase some six years ago, bears little relation to its present valuation, which the court would be permitted to examine when determining the appropriateness of treble or punitive damages.  However, NDS has not met its burden to demonstrate how or why the inclusion of this figure is unduly prejudicial.  Thus, the court finds that NDS has not overcome the general judicial disfavor for striking pleadings, and its motion to strike paragraph 14 will accordingly be denied.  *See Fiorentino v. Cabot Oil & Gas Corp.*, 750 F. Supp. 2d 506, 509 (M.D. Pa. 2010) ("Relief under Federal Rule of Civil Procedure 12(f) is generally disfavored, and will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties, or if the allegations confuse the issues in the case.") (quotation marks omitted).

---

the purchase price from the complaint, and otherwise has no objection to Roamingwood's allegation that NDS is owned by parent company NORMA Group.  (Doc. 15, pp. 2–3.)

## 2.  Paragraph 32 will not be Stricken.

NDS claims that the check valve flapper at issue in paragraph 32 failed for a different reason than those in this case, and therefore should be stricken as irrelevant.  (Doc. 12, p. 4.)  In support, NDS attaches a preliminary report completed by Vollmer-Gray Engineering Laboratories, Inc. describing the check valve at issue in the Arizona case that Roamingwood cites in paragraph 32.  (Doc. 13.)  Roamingwood rejoins that the court may not consider NDS's attached exhibit at the pleadings stage.  (Doc. 14, p. 15.)  In addition, Roamingwood claims that paragraph 32 is intended to show that NDS had notice of its defective flapper design, yet continued to manufacture and distribute this product, a factor which could support a claim for punitive or treble damages in this case.  (*Id.* at 16.)  Paragraph 32 of the amended complaint states that:

> Plaintiff further understands that NDS had received, and therefore was on notice, of multiple failures of its check valve flapper failures.  NDS was previously found to be 100% negligent for the distribution of a check valve used for swimming pools after its flapper failed and resulted in personal injury.  *See Postil v. National Diversified Sales, Inc., et al.*, 2016 WL 5243139 (Ariz. Super. July 29, 2016) (liability verdict against NDS award of $250,000 in damages to plaintiff).

(Doc. 9, p. 11.)

The court notes that "[m]otions to strike are decided on the pleadings alone." *Zaloga v. Provident Life & Accident Ins. Co. of Am.*, 671 F. Supp. 2d 623, 633 (M.D. Pa. 2009) (citing *Hanover Ins. Co. v. Ryan*, 619 F. Supp. 127, 132 (E.D.

Pa. 2007)).  Therefore, the court cannot consider NDS's attached exhibit at this stage.  (*See* Doc. 13.)  Based on the face of the complaint, which the court is required to consider in the light most favorable to the plaintiff, paragraph 32 indicates that NDS was on notice of other check valve failures, an assertion which is not immaterial, impertinent, or scandalous for purposes of this litigation. Therefore, the court will deny NDS's motion to strike paragraph 32 of the amended complaint, noting that this paragraph is subject to the test of discovery, and that the court will be permitted to consider NDS's exhibit at a later stage after the exhibit is produced in discovery.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss and to strike will be denied.  (Doc. 11.)  An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: December 21, 2020