# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROAMINGWOOD SEWER & WATER ASSOCIATION, | : | Civil No. 1: 20-CV-00640 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NATIONAL DIVERSIFIED SALES, INC., | : | |
| | : | |
| Defendant, | : | |
| | : | |
| v. | : | |
| | : | |
| JAMES T. O'HARA, INC. | : | |
| | : | |
| Third-Party Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court are the motions filed by Defendant, National Diversified Sales, Inc. ("NDS"), and Plaintiff, Roamingwood Sewer and Water Association ("Roamingwood"), on August 31, 2022, for partial summary judgment addressing certain claims in Roamingwood's amended complaint.  (Docs. 109, 111.)  NDS seeks summary judgment on Counts II and IV, while Roamingwood seeks summary judgment on Counts I, II, and IV.  The motions have been fully briefed and are ripe.  For the reasons that follow, the court will grant NDS' motion with respect to the UTPCPL claim and grant Roamingwood's motion with respect to the strict liability and breach of implied warranty claims.

### FACTUAL AND PROCEDURAL BACKGROUND[1]

The initial action was brought by Roamingwood to recover damages related to the failure of allegedly defective check valves which NDS manufactured.  (Doc. 9.)  As a matter of organizational background, The Hideout, a planned gated residential community in Wayne County, Pennsylvania, was initially established in 1970.  (Doc. 113-1, ¶¶ 2–3.)  Ten years later, pursuant to requests from the residents of The Hideout, the Wayne County Board of Commissioners created the South Wayne County Water and Sewer Authority ("SWA").  (*Id.* at ¶ 10.)  That same year, Roamingwood was established as the exclusive operator of sewer and water services to The Hideout.  (*Id.* at ¶ 2.)

Roamingwood is organized as a Pennsylvania not-for-profit corporation. (*Id.* at ¶ 1.)  As stated in its bylaws, Roamingwood has members, and those members possess membership rights.  (Doc. 9-1, pp. 7–8.)[2]  Its members fall into two classes: (a) owners of one or more lots in The Hideout; and (b) the homeowners' association of The Hideout.  (*See id.* at 8–9.)

---

[1] Any additional factual recitation that is necessary for the discussion of each specific issue is included in the Discussion section of this memorandum.  In considering the instant motion for summary judgment, the court relied on the uncontested facts.  Where facts were disputed, the court viewed the facts in the light most favorable to the nonmoving party and has drawn all inferences in favor of the nonmovant, pursuant to the relevant standard for deciding a motion for summary judgment.  *See Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

[2] For ease of reference, the court utilizes the page number from the CM/ECF header.

Roamingwood is an agent of SWA.  (Doc. 113-1, ¶ 10.)  According to Roamingwood, SWA was meant to be "a finance vehicle to issue municipal bonds for Roamingwood to acquire the water and sewer system of The Hideout."  (*Id.*) The Hideout's protective covenants require that all properties within the community are connected to the Roamingwood sewage system.  (*Id.* ¶ 3.)

In May 2009, Roamingwood and SWA entered into a sale agreement "whereby Roamingwood sold to [SWA] the water and sewer collections systems, the treatment plant, the pumping stations, the rights in any and all easements and all necessary appurtenant equipment, for a dollar."  (Doc. 113-3, p. 10.)  As part of this agreement, SWA was required to enter into an operating agreement with Roamingwood, wherein SWA would name Roamingwood the agent of SWA.  (*Id.*)

By August 2017, Roamingwood was undertaking the final stage, Stage III, of an overhaul of The Hideout's sewer system.[3]  (Doc. 113-1, ¶ 15–25.)  As part of Stage III, Roamingwood needed to install 1,111 check valves.  (*Id.* ¶ 71.)  The specific check valve, which NDS designed and manufactured, was known as the KSC-2000-LC.  (Doc. 111-1, ¶ 15.)

In Stages I and II, similar check valves were used.  (Doc. 113-1, ¶¶ 33–35.) None of the check valves used in Stage I has failed and only a single check valve

---

[3] Stages I and II started in 2013 and finished by January 2017.  (Doc. 113-1, ¶ 25.)  By November 2018, Stage III was largely completed.  (Doc. 111-1, ¶ 12.)

used in Stage II has failed.  (*Id.* ¶ 36.)  In May of 2016, NDS decided to change the design of their check valves.  (*Id.* ¶ 44.)  The change related to the structure of the check valve's flapper assembly and the way in which the flapper assembly was attached.  (*Id.*)

NDS sold the KSC-2000-LC check valves exclusively to The Lateral Connection Corp. ("TLCC").  (Doc. 111-1, ¶ 17.)  TLCC purchased the check valves and incorporated them into a larger component—a curb stop, also called a shut off valve or lateral connection.  (*Id.* ¶¶ 17, 31; Doc. 122, ¶ 17.)  In simplified terms, the check valve allows for sewage to pass in one direction—away from the residence but not towards it.  (*See* Doc. 113-1, ¶ 26.)  TLCC sold the lateral connections which were used for Stage III to a distributor, Clay Products.  (Doc. 111-1, ¶ 18.)  Clay Products, in turn, sold the lateral connections to James T. O'Hara, Inc. ("O'Hara").  (*Id.*)

For Stage III of The Hideout's overhaul, Roamingwood hired James T. O'Hara, Inc. ("O'Hara") as general contractor.  (Doc. 1, pp. 1–3.)  On June 1, 2017, Roamingwood purchased its first order of 375 check valves for Stage III.  (Doc. 113-1, ¶ 49; Doc. 123, ¶ 49; Doc. 113-9, p. 27.)

Roamingwood alleges that NDS had notice of the failures in its check valves well before they began failing at The Hideout.  It alleges that on June 19, 2017,

TLCC notified NDS of 42 defective check valves in a recent batch.  (Doc. 113-1, ¶ 50.)  In September, TLCC reported to NDS additional issues with its check valves which could result in or contribute to a sonic weld failure similar to those that occurred in the failed valves that were installed in The Hideout.  (*Id.* ¶¶ 53–54; *see id.* ¶ 103–104.)  Roamingwood further alleges that, on November 14, 2017, TLCC notified NDS of further failures of the sonic weld in the KSC-2000-LC in a project in Indiana.  (*Id.* ¶ 56.)[4]  Of an initial 43 valves and 20 replacement valves installed in the Indiana project, 25 failed.  (*Id.* ¶¶ 57–60.)  By December 20, 2017, NDS told TLCC that it had "a good understanding of what happened" with the failed check valves.  (*Id.* ¶ 66.)

By January 24, 2018, 230 out of the eventual 1,111 Stage III check valves had been installed.  (*Id.* ¶ 71.)  Then, in March 2018, NDS internally discussed discontinuing their sale of the KSC-2000-LC.  (*Id.* ¶ 72.)  In determining whether to discontinue the check valve, NDS acknowledged that the flapper assembly was the "weak link" and that their manufacturing for the flapper assembly required "tighter controls."  (*Id.* ¶ 73.)  The processes they had in place at the time would "not produce sufficient repeatable quality parts."  (*Id.*)  NDS recognized that discontinuing its check valve would increase their "exposure to liability from the

---

[4] NDS disputes that TLCC provided NDS with notice of valve failures "due to a sonic weld failure prior to November 14, 2017." (Doc. 123, ¶ 56.)  But NDS does not dispute that, on that date, TLCC provided NDS notice of check valve failures in the Indiana project.  (*Id.*)

claims standpoint." (*Id.* ¶ 74.)  Roamingwood asserts that NDS, knowing that the check valves were defective, continued to sell them until the existing claims were resolved. (*Id.* ¶ 77.)  NDS disputes that, asserting that its last "substantial sale" of check valves was to TLCC on December 5, 2017. (Doc. 123, ¶ 77.)  But NDS does not explicitly state that it made no further sales beyond December 5, 2017, only that it made no further *substantial* sales.

Roamingwood had its first Stage III check valve failure on May 27, 2018. (Doc. 113-1, ¶ 87.)  Roamingwood alleges that such failure can lead to a sewage backup in the street or a home. (*Id.* ¶¶ 88–89.)  By October 26, 2018, nine check valves had failed. (*Id.* ¶ 95.)  Roamingwood submitted two of the nine failed valves to an engineer. (*Id.* ¶ 96.)  NDS issued a Return Merchandise Authorization ("RMA") to TLCC for the two valves—the RMA described the valves as "defective." (*Id.* ¶ 97.)  By January 2, 2019, a total of 11 Stage III check valves had failed. (*Id.* ¶ 98.)  And by late-December of 2019, multiple homeowners had raw sewage back up into their homes, although NDS disputes that the sewage resulted from check valve failures. (Doc. 113-1, ¶¶ 94, 102; Doc. 123, ¶¶ 94, 102.)

On January 29, 2020, the parties engaged Micron, Inc. to conduct a visual and microscopic inspection of 10 failed check valves. (Doc. 113-1, ¶ 103.)  This inspection revealed that the ultrasonic weld intended to hold together the two pieces of the flapper assembly was incomplete. (*Id.* ¶ 104.)

As of August 31, 2022, 56 of the Stage III check valves had failed and been replaced.  (Doc. 113-1, ¶ 110.)  NDS did not dispute the failure of these check valves.  (Doc. 123, ¶ 110.)  And, as of October 6, 2022, Roamingwood alleges that 73 check valves had failed.  (Doc. 122, ¶ 29.)

Because this memorandum is for the benefit of the parties, the court omits some procedural developments and most of the history of the third-party claims, which are not at issue presently.  The operative four-count amended complaint in this action was filed on May 12, 2020.  (Doc. 9.)  Count I raised a claim for strict liability, Count II for breach of implied warranty of merchantability and fitness for a particular purpose, Count III for negligence, and Count IV for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL").  (*Id.* at 14–20.)

NDS filed a motion to dismiss the action under Federal Rule of Civil Procedure 12(b)(6), which the court denied.  (Docs. 11, 29.)  In September of 2021, NDS moved to dismiss the action for lack of Article III standing.  (Doc. 65.)  The court denied this motion.  (Doc. 71.)

On April 27, 2022, two days before the close of discovery, the court entered a 60-day stay of all deadlines so the parties could pursue mediation.  (Doc. 85.)

Mediation was unsuccessful, and NDS and Roamingwood filed the instant motions for summary judgment on August 31, 2022.  (Docs. 111, 113.)

## JURISDICTION

Because there is complete diversity between the parties and the amount in controversy is greater than $75,000, the court has original jurisdiction over this case under 28 U.S.C. § 1332.  Venue is appropriate under 28 U.S.C. § 1391.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case."  *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288

(3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)).  The court may not "weigh the evidence" or "determine the truth of the matter."  *Anderson*, 477 U.S. at 249.  Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial."  *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'"  *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support

of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

NDS argues that Roamingwood's claim for breach of implied warranty fails because NDS expressly disclaimed all implied warranties. (Doc. 111, p. 1.) It also argues that Roamingwood's claim under the UTPCPL fails because (1) Roamingwood lacks standing to bring a UTPCPL claim, (2) there is no evidence that NDS knew of the alleged defect in the check valve at the time it sold the valves to TLCC, (3) NDS had no duty to inform Roamingwood of any defects because there is no evidence that any such alleged defect was likely to cause significant bodily harm, and (4) there is no evidence that NDS made any representations to Roamingwood about the check valves let alone misrepresentations. (Doc. 112, pp. 7–8.) For its part, Roamingwood argues that it is entitled to summary judgment on these same two claims and for its strict liability claim. (Doc. 113, p. 1.)

### A.   Roamingwood is Entitled to Summary Judgment on its Breach of Implied Warranty Claim.

Roamingwood argues that it is entitled to summary judgment for its breach of implied warranty claim based on the undisputed facts. Although it brings the claim for breach of implied warranty on two grounds—merchantability and fitness for a particular purpose—its arguments for summary judgment only focus on merchantability.

Under Pennsylvania law, "to be merchantable, goods must be 'fit for the ordinary purposes for which such goods are used.'" *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992) (quoting 13 Pa. Cons. Stat. Ann. § 2314(b)(3)). To bring a claim for breach of implied warranty, a plaintiff must show that "the equipment they purchased from defendant was defective." *Id.* To do so, it is their burden to show that: "(1) that the product malfunctioned; (2) that plaintiffs used the product as intended or reasonably expected by the manufacturer; and (3) the absence of other reasonable secondary causes." *Id.*

NDS argues that Roamingwood is not entitled to summary judgment on this claim because its "entire argument" for this claim "rests on the incorrect assertion" that the KSC-2000-LC check valves "were not suitable for use in a low-pressure sewer system." (Doc. 124, p. 26.) NDS asserts that Roamingwood supports its implied warranty claim by misreading an NDS document. Roamingwood states that "NDS concluded the Check valves were not suitable for use in a low-pressure

sewer system due to its 'poor sonic weld' that 'makes [the] part useless' for its intended purpose in a pressurized sewer system." (Doc. 114, p. 39.) NDS points out that the internal quotations were not NDS' conclusions, but instead were customer complaints memorialized in an NDS investigation of systemic problems with the check valves. (Doc. 124, p. 26.)

Even seen in the light most favorable to the non-movant, NDS has failed to point to any facts which would allow a reasonable jury to find that Roamingwood's breach of implied warranty claim fails. Roamingwood has pointed to evidence to show that the KSC-2000-LC failed in Roamingwood's Stage III endeavor. NDS has not disputed that, as of August 2022, 56 of the Stage III checked valves failed. (Doc. 113-1, ¶ 110; Doc. 123, ¶ 110.) There is no dispute that such a failure constitutes a malfunction. There is no dispute that the check valves in Stage III were used as intended or reasonably expected by the manufacturer. Nor is there evidence of any other reasonable secondary cause. The fact that Roamingwood points to an NDS document to explain why or how the malfunction occurred is not material to the fact *that* the malfunction occurred. Therefore, NDS' contention that Roamingwood has mischaracterized NDS' document has no bearing on the implied warranty claim.

NDS argues that it is entitled to summary judgment because it disclaimed all implied warranties via its public-facing website. (Doc. 112, p. 26; Doc. 111-1,

¶ 35.)  Roamingwood counters by arguing that the court in *Moscatiello v. Pitt. Contractors Equip. Co.*, 595 A.2d 1198, 1204 (Pa. Super. 1991), established that, under Pennsylvania law, a "warranty exclusion will not bind a remote buyer unless the term is communicated to him."  (Doc. 121, p. 24 (quoting *Amato v. Mapei Corp.*, No. 2:03-cv-2130, 2005 WL 3406417, at *5 (M.D. Pa. Dec. 12, 2005)).)

NDS does not directly address *Moscatiello*.  Instead, it cites various cases from the U.S. District Courts in Pennsylvania which address what suffices as sufficiently conspicuous to disclaim an implied warranty.  (Doc. 130, pp. 17–18.) NDS argues that it "does not control the sale and distribution of check valves once they have been sold to TLCC and incorporated into a lateral connection."  (*Id.* at 18.)  It argues, therefore, that it has no ability to transmit its warranty and terms of sale to remote buyers.  (*Id.*)  This may be true, but that does not change the law. The law protects consumers, including remote buyers, and places the burden on parties, such as NDS, to communicate disclaimers.  NDS provides no legal support, nor substantive argument, to support its assertion that a message on its website is sufficient to bar a remote buyer from pursuing a cause of action established under Pennsylvania law for a breach of an implied warranty of merchantability.

For the foregoing reasons, the court finds that Roamingwood is entitled to summary judgment for its breach of implied warranty of merchantability claim.

**B.    NDS is Entitled to Summary Judgment on Roamingwood's UTPCPL Claim.**

The UTPCPL provides a private cause of action for "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of . . . a method, act or practice declared unlawful by section 3 of this act." 73 Pa. Stat. Ann. § 201-9.2(a).  For purposes of the statute, a person may be a natural person, corporation, or any other legal entity.  § 201-2(2).

NDS argues that Roamingwood's UTPCPL claim fails because, based on the undisputed facts, the UTPCPL does not apply to entities like Roamingwood or products like the KSC-2000-LC.  (Doc. 112, pp. 11–14.)  NDS argues that Roamingwood never purchased anything from NDS, even indirectly.  Instead, NDS sold the check valves to TLCC, which sold the valves (now incorporated into laterals) to a distributor; the distributor sold the laterals to O'Hara; and then O'Hara installed the laterals for and sold them to SWA.  (*Id.* at 11–12.)  Because Roamingwood does not now, nor did it ever, own the valves, it cannot bring a claim under the UTPCPL.  (*Id.*)  NDS also argues that the UTPCPL does not apply to the check valves because the statute applies to purchases of products made "primarily for personal, family, or household use."  (*Id.* at 11 (quoting *Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641, 645 (Pa. Super. 1990)).)  Nor, NDS argues, can Roamingwood bring claims on behalf of

14

residents of The Hideout, because it is not a homeowners' association; instead, it is an agent of the municipality.[5]  (*Id.* at 16–19.)

Roamingwood argues that its status as an agent of SWA has no bearing on whether it can bring a claim against NDS under the UTPCPL.  (Doc. 114, p. 30 n.3.)  Instead, Roamingwood points to *Rossi v. Firemen's Ins. Co. of Newark, N.J.*, 165 A. 16, 18 (Pa. 1932), in which the Pennsylvania Supreme Court concluded that an agent may simultaneously serve two principals so long as the duties of the agent to the two are such that there can be no conflict between the agent's twin duties of loyalty.  (Doc. 131, p. 7 n.1.)

Next, Roamingwood argues that the check valves were purchased primarily for personal, family, or household residential unit owners.  (Doc. 114, p. 28 (quoting *Valley Forge*, 574 A.2d at 649).)  Roamingwood argues that it is similar to the condo association in *Valley Forge*.  In *Valley Forge*, the Superior Court of Pennsylvania noted that, under its precedent, "a condominium association could represent individual unit owners who had purchased units for residential purposes by pursuing legal redress acting in a representative capacity on behalf of the individual unit owners."  574 A.2d at 648 (citing *1000 Grandview Ass'n v. Mt.*

---

[5] NDS also argues that it should be granted summary judgment because there is no evidence that it knew the check valves were defective.  (Doc. 112, p. 22–23.)  In the alternative, it argues that, even if it knew the check valves were defective, it did not have duty to disclose the defect.  (*Id.* at 24.)  Finally, NDS argues that it did not make any misrepresentations to Roamingwood about the check valves.  (*Id.* at p. 25.)  The court does not address these arguments because Roamingwood's UTPCPL claim fails as a matter of law for the reasons addressed in this memo.

*Wash. Ass'n*, 434 A.2d 796 (1981)).  The Superior Court concluded that this representative standing extended to a claim under the UTPCPL because the association had purchased the building's roof primarily for the condo dweller's residential use, "rather than the condominium association's putative business purpose of managing the condominium building."  *See id.* at 648.  The Court concluded that the roofing materials which the association purchased were covered under the UTPCPL and the association could raise a UTPCPL claim.

NDS counters that the present instance is dissimilar to *Valley Forge*, where the association purchased the roof primarily for household purposes.  (Doc. 112, p. 16–19.)  It argues that Roamingwood neither acted "as the legally authorized representative" of the Hideout's residents nor "purchased the check valves on behalf of the owners for their household use."  (*Id.* at 17 (internal quotation marks omitted).)  Instead, NDS argues that Roamingwood's conduct was more akin to *Cumberland Valley School District v. Hall-Kimbrell Environmental Services*, 443 Pa. Super. 38 (1994).  In that case, the court held that the school district—a public entity—could not bring a claim under the UTPCPL.  In purchasing asbestos abatement services for school buildings, the school district was acting "pursuant to a public purpose" but not "for the personal, family or household benefit of . . . taxpayers and students."  (Doc. 112, p. 18 (quoting *Cumberland Valley Sch.*, 443 Pa. Super. at 42–43).)

16

### 1. It is immaterial that SWA, not Roamingwood, purchased the check valves.

The fact that Roamingwood does not own the check valves has no impact on their ability to bring a UTPCPL claim. The text of the statute, which NDS quotes, clearly states that it provides a private cause of action for a person who "purchases *or leases*" goods. (Doc. 124, p. 10 (emphasis added) (quoting § 201-9.2(a)).) In its briefing, NDS argues that, because SWA and not Roamingwood owns the check valves, Roamingwood has no standing to bring this claim. But it is undisputed that Roamingwood leases the sewer lines from SWA. (Doc. 111-1, ¶ 3.) And NDS states, as an undisputed fact, that the check valves "were installed in the public use part of the sewer system" that Roamingwood leased back from SWA and "for which Roamingwood is responsible." (Doc. 112, p. 18; Doc. 124, p. 12.) Therefore, it is clear from the record that, although Roamingwood did not purchase the check valves, it does lease them.

### 2. The check valves were not purchased or leased primarily for household use.

Roamingwood cannot bring a UTPCPL claim for the Stage III check valves, however, because they were not purchased primarily for household use.[6] In this court's memorandum opinion at the motion to dismiss phase, it viewed the

---

[6] Because the court concludes that the check valves were not purchased for household use, it will not address whether Roamingwood can bring its claim in a representative capacity on behalf of the residents of The Hideout.

pleadings in the light most favorable to NDS.  Given the liberal construction that UTPCPL claims are entitled to receive, the court concluded that Roamingwood adequately pleaded that the check valves at issue were purchased primarily for household use.  (Doc. 28, p. 16.)  Now, having the full suite of facts provided by discovery, and based upon those undisputed facts, the court comes to the conclusion that the check valves were not purchased primarily for household use.

As the court has noted, when determining whether a good is used primarily for household use, the court looks to the purpose of the purchase rather than the type of product purchased.  (*Id.* at 14 (quoting *Valley Forge*, 574 A.2d at 648).)  In *Valley Forge*, the Superior Court noted that "a leak-proof roof is ultimately essential to the structural integrity of the whole condominium building."  574 A.2d at 649.  And, in that case, the whole condo building was primarily used for residential use.  *Id.* at 648.

Reasonably, Roamingwood submits that its "ability to safely remove raw sewage away from each home in the Hideout and into a sewage treatment system is essential for the use of the residential property."  (Doc. 114, p. 30.)  While this may be true, Roamingwood's real argument is that its entire sewer system, included the check valves, was installed primarily for household purposes and is therefore covered under the UTPCPL.  It argues that "[w]ithout a functioning sewer system, including the check valve, each Hideout residence would be unlivable."  (*Id.*)

Therefore, the argument proceeds, the sewer system is like the roof in *Valley Forge*, which "was deemed to be essential to the structural integrity of the whole condominium building." (*Id.*) Roamingwood stretches *Valley Forge* too far. The court will not conclude that the entire sewer system of The Hideout, and all its components therein, was primarily for household use and therefore subject to the UTPCPL. The sewer system was overhauled by a government entity, SWA, or an agent of that entity, Roamingwood. It was not built by a condo association or homeowner's association. And a development-wide sewer system is not the same as a roof.

More narrowly, the Stage III check valves were purchased by SWA, a municipal entity. They are managed by Roamingwood, an agent of that entity. They are located in the portion of the sewage system for which Roamingwood, and not the homeowner, is responsible. (Doc. 111-1, ¶ 27.) The present instance is not like *Valley Forge*. In that case, a condo association acted on behalf of its residents to purchase a roof, which is a necessity to all residential dwellings. But here, Roamingwood acted as an agent of SWA to perform the function of a water and sewage utility. In purchasing the check valves, it was acting as a utility and not as a representative of consumers. The check valves were not purchased primarily for

household use.[7]  As a result, NDS is entitled to summary judgment with respect to the UTPCPL claim that Roamingwood has raised.

**B. Roamingwood is Entitled to Summary Judgment on its Strict Liability Claim.**

Under Pennsylvania law, a court may apply one of two tests when assessing a strict liability claim for a manufacturing or design defect: (1) the risk-utility test or (2) the consumer expectation test.  *See Tincher v. Omega Flex*, 104 A.3d 328, 387 (Pa. 2014).  As NDS notes in its briefing, the consumer expectations test "is only applicable 'where the question of how safely the product should have performed can be answered by the common experience of its users.'"  (Doc. 124, p. 23 (quoting *Commonwealth v. Monsanto Co.*, 269 A.3d 623, 657 (Pa. Commw. Ct. 2021)).)

Under the consumer expectation test, a product is "in a defective condition if the danger is unknowable and unacceptable to the average or ordinary consumer." (*Id.* at 24 (quoting *Tincher*, 104 A.3d at 387).)  The court in *Tincher* noted, a

---

[7]Any residential property that is connected to a sewer system must be structured to not fill a home with sewage.  But that basic point does not answer the question here.  The court notes that residential properties have other functional needs that are not primarily for residential use *per se*. For example, many homes are connected to a centralized public water system.  The water pipes, presumably installed and maintained by the municipality or utility, are essential not only for the supply of water but also for ensuring that the water is safe.  But that does not render public utility water pipes primarily for residential use.  Another example comes from the electrical grid to which most homes are connected.  Electrical grids have components, like transformers, which are essential for a power grid that functions and provides electricity to residences in a usable and safe form.  But that does not make transformers, used by power utilities, primarily purchased for household use.

product "should be strong enough to perform as the ordinary consumer expects."

104 A.3d at 388.  A product is not defective according to consumer expectation "if

the ordinary consumer would reasonably anticipate and appreciate the dangerous

condition of the product and the attendant risk of injury of which the plaintiff

complains."  *Id.* at 387 (citation omitted).  The court in *Tincher* gave examples.  A

knife would not be subject to strict liability on account of being sharp, nor would

butter for impacting a consumer's heart health.  *Id.* ("Good butter is not

unreasonably dangerous merely because, if such be the case, it deposits cholesterol

in the arteries and leads to heart attacks; but bad butter, contaminated with

poisonous fish oil, is unreasonably dangerous.") (quoting Restatement (Second) of

Torts § 402A cmt. i).

Here, NDS asserts that a sewage spill is not an unknowable danger

associated with sewer systems.  (Doc. 124, p. 24.)  It also asserts that there is no

evidence to suggest that such a spill could cause health risks.  (*Id.*)  NDS does not

point to any evidence to support its proposition that an ordinary consumer would

know that upgrading a sewer valve would create a risk that their home or basement

would fill with sewage.  Nor does NDS point to any evidence supporting the

proposition that an ordinary consumer would accept such risk.

NDS's arguments are unconvincing.  It conflates the question of whether a

danger is conceivable with whether an ordinary consumer would reasonably

anticipate it.  To illustrate, it is conceivable that an automobile, when rear-ended, could burst into flames.  That very thing has happened as in the history of automobiles.  But, in the present era, an ordinary consumer would surely not expect that an automobile carries that risk.

Nor would an ordinary consumer reasonably anticipate that a new sewer valve would allow sewage to seep into their home.  Indeed, the check valve has only one purpose: to allow sewage to flow in one direction but not the other.  To say that a reasonable consumer would expect it to allow a sewage leak is to say that said consumer expects it not to work at all.

NDS asserts that the sewage spills associated with its failed check valves do not pose any risk to an ordinary consumer.[8]  Roamingwood counters by pointing out that the Pennsylvania Department of Environmental Protection ("DEP") has determined that the release of sewage is a health hazard.  (Doc. 131, p. 22.) Specifically, the DEP has stated that "[m]alfunctioning sewage disposal systems . . . pose a serious threat to public health and the environment."  (*Id.*; Doc. 122-2, p. 2.)  The threat includes "expos[ing] humans and animals to various bacteria,

---

[8] NDS also asserts, without citing any evidence on the record, that no sewage spills have occurred at The Hideout.  (Doc. 124, p. 24.)  Because NDS does not support this assertion, the court does not make it a factual finding.

viruses, and parasites."[9]  (Doc. 122, ¶ 117; Doc. 122-2, p. 2.)  Accordingly,

Roamingwood has established that sewage leaks cause health risks.

Next, without providing any argument in support, NDS asserts that the court

should apply the risk-utility test and not the consumer expectation test.  (Doc. 124,

p. 23.)  But in laying out the seven factors of the risk-utility test, NDS only argues

one.  (*Id.* at 24–26.)  Regarding the third factor, "the availability of a substitute

product which would meet the same need and not be as unsafe," NDS argues that

Roamingwood and its two valve design experts have provided no alternative

design.  (*Id.* at 25–26.)

Roamingwood counters by adding an important nuance to the third factor in

the risk-utility test—the availability of a substitute product.  It points out that a

plaintiff may either "present this evidence by reference to the products already

available on the market or through expert testimony."  (Doc. 131, p. 23 (emphasis

omitted) (quoting *Zollars v. Troy-Built, LLC*, No. CV-10-924, 2012 WL 4922689,

at *3 (W.D. Pa. 2012)).)  Roamingwood asserts that NDS itself already sold an

---

[9] Indeed, while an ordinary consumer would not expect a sewage valve to fail its sole purpose, they would surely be aware that there are health issues related to sewage.  Prominent national and international institutions have well-documented such health issues.  *See Handling Human Waste or Sewage*, Centers for Disease Control and Prevention, https://www.cdc.gov/healthywater/emergency/sanitation-wastewater/workers_handlingwaste.html; *Better  Sewage Treatment Critical for Human Health and Ecosystems*, UN Environmental Programme, https://www.unep.org/news-and-stories/story/better-sewage-treatment-critical-human-health-and-ecosystems; *Impact of Sewer Overflow on Public Health: A Comprehensive Scientometric Analysis and Systematic Review*, PubMed, https://pubmed.ncbi.nlm.nih.gov/34216613/.

available substitute.  (*See id.*)  Once NDS discontinued the KSC-2000-LC, it immediately began substituting that check valve with another of its models—the KSC-1500-LC.  (*Id.*; Doc. 132, ¶ 1.)  Roamingwood asserts that the KSC-1500-LC check valve has not had any reported failures either at The Hideout or elsewhere.  (Doc. 131, p. 23.)  The court concludes that, if the court were applying the risk-utility test, Roamingwood would have met its burden with respect to the third factor.

The court concludes that the consumer expectation test is applicable and that the KSC-2000-LC that NDS manufactured for Stage III of Roamingwood's upgrade fails the test.  The court also concludes that, if it had applied the risk-utility test, NDS would have failed to raise sufficient facts to show that Roamingwood is not entitled to summary judgment.  As a result, the court will grant Roamingwood summary judgment on its strict liability claim.

CONCLUSION

For the reasons provided above, the court will grant in part and deny in part

NDS' and Roamingwood's motions for summary judgment.  Specifically, the court

will deny NDS' motion as it applies to the breach of implied warranty claim but

grant it as it applies to the UTPCPL claim.  The court will grant Roamingwood's

motion as it applies to the breach of implied warranty and strict liability claims but

deny it as it applies to the UTPCPL claim. A corresponding order will follow.

s/Jennifer P. Wilson<br>
JENNIFER P. WILSON<br>
United States District Court Judge<br>
Middle District of Pennsylvania

Dated: April 4, 2023