## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROAMINGWOOD SEWER & WATER ASSOCIATION, | : | Civil No. 1:20-CV-00640 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NATIONAL DIVERSIFIED SALES, INC., | : | |
| | : | |
| Defendant, | : | |
| | : | |
| v. | : | |
| | : | |
| JAMES T. O'HARA, INC. | : | |
| | : | |
| Third-Party Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is the motion filed by Plaintiff Roamingwood Sewer and Water Association ("Roamingwood") to determine the scope of damages it may seek from Defendant National Diversified Sales, Inc. ("NDS"). (Doc. 170.) This motion follows the court granting summary judgment to Roamingwood for its claims of strict liability (Count I) and breach of implied warranty (Count II) against NDS. (Doc. 165.) For the reasons that follow, the court finds that Roamingwood may seek damages for all check valves at issue in this motion, incidental and consequential damages, and punitive damages.

1

## FACTUAL AND PROCEDURAL BACKGROUND[1]

This action was brought by Roamingwood to recover damages related to the failure of defective check valves which NDS manufactured.  (Doc. 9.)  The defective check valves at issue are installed in properties within The Hideout, a residential community in Pennsylvania.  (Doc. 113-1, ¶¶ 2–3.)  Roamingwood is the exclusive operator of sewer and water services to The Hideout.  (*Id.* at ¶ 2.)

By August 2017, Roamingwood was undertaking the final stage, Stage III, of an overhaul of The Hideout's sewer system.[2]  (*Id.* at ¶ 15–25.)  As part of Stage III, Roamingwood needed to install 1,111 check valves.  (*Id.* ¶ 71.)  The specific check valve that was installed was known as the KSC-2000-LC, which was designed and manufactured by NDS.  (Doc. 111-1, ¶ 15.)

NDS sold the KSC-2000-LC check valves exclusively to The Lateral Connection Corp. ("TLCC").  (*Id.* at ¶ 17.)  TLCC purchased the check valves and incorporated them into a larger component called a lateral connection.  (*Id.* ¶¶ 17, 31; Doc. 122, ¶ 17.)  In simplified terms, the check valve allows for sewage to pass in one direction—away from the residence, but not towards it.  (*See* Doc. 113-1, ¶

---

[1] Any additional factual recitation that is necessary for the discussion of each specific issue is included in the Discussion section of this memorandum.  Because the court is writing primarily for the benefit of the parties, only the necessary information is included in this memorandum.  A more fulsome explanation of the factual and procedural history of this case can be found in the court's summary judgment memorandum.  (Doc. 164.)

[2] Stages I and II started in 2013 and finished by January 2017.  (Doc. 113-1, ¶ 25.)  By November 2018, Stage III was largely completed.  (Doc. 111-1, ¶ 12.)

26.)  TLCC sold the lateral connections which were used for Stage III to a distributor, Clay Products.  (Doc. 111-1, ¶ 18.)  Clay Products, in turn, sold the lateral connections to James T. O'Hara, Inc. ("O'Hara").  (*Id.*)

For Stage III of The Hideout's overhaul, Roamingwood hired James T. O'Hara, Inc. ("O'Hara") as general contractor.  (Doc. 1, pp. 1–3.)  On June 1, 2017, Roamingwood purchased its first order of 375 check valves for Stage III.  (Doc. 113-1, ¶ 49; Doc. 123, ¶ 49; Doc. 113-9, p. 27.)

Before valves began failing at The Hideout, NDS was notified of instances in which the same check valves had failed.  For example, on June 19, 2017, TLCC notified NDS of 42 defective check valves in a recent batch.  (Doc. 113-1, ¶ 50; Doc. 123, ¶ 50.)  In September, TLCC reported to NDS additional issues with its check valves which could result in or contribute to a sonic weld failure similar to those that occurred in the failed valves that were installed in The Hideout.  (Doc. 113-1, ¶¶ 53–54, 103–104; Doc. 123, ¶¶ 53–54, 103–104.)  On November 14, 2017, TLCC notified NDS of further failures of the sonic weld in the KSC-2000-LC in a project in Indiana.  (Doc. 113-1, ¶ 56; Doc. 123, ¶ 56.)  Of an initial 43 valves and 20 replacement valves installed in the Indiana project, 25 failed.  (Doc. 113-1, ¶¶ 57–60.)  By December 20, 2017, NDS told TLCC that it had "a good understanding of what happened" with the failed check valves.  (Doc. 113-1, ¶ 66; Doc. 123, ¶ 66.)

By January 24, 2018, 230 out of the eventual 1,111 Stage III check valves had been installed.  (Doc. 113-1, ¶ 71; Doc. 123, ¶ 71.)  Then, in March 2018, NDS internally discussed discontinuing their sale of the KSC-2000-LC.  (Doc. 113-1, ¶ 72; Doc. 123, ¶ 72.)  In determining whether to discontinue the check valve, NDS acknowledged that the flapper assembly was the "weak link" and that their manufacturing for the flapper assembly required "tighter controls."  (Doc. 113-1, ¶ 73; Doc. 123, ¶ 73.)  The processes they had in place at the time would "not produce sufficient repeatable quality parts."  (Doc. 113-1, ¶ 73; Doc. 123, ¶ 73.)  NDS recognized that discontinuing its check valve would increase their "exposure to liability from the claims standpoint."  (Doc. 113-1, ¶ 74; Doc. 123, ¶ 74.)  Despite the valve failures and manufacturing concerns, NDS continued to sell the check valves.  (Doc. 113-1, ¶ 77; Doc. 123, ¶ 77.)  NDS further asserts that its last "substantial sale" was when it sold 240 valves to TLCC on December 5, 2017, before it announced a "partial hold" on the KSC-2000-LC.  (Doc. 123, ¶ 77.)

Roamingwood had its first Stage III check valve failure on May 27, 2018. (Doc. 113-1, ¶ 87.)  Roamingwood alleges that such failure can lead to a sewage backup in the street or a home.  (*Id.* ¶¶ 88–89.)  By October 26, 2018, nine check valves had failed.  (*Id.* ¶ 95.)  Roamingwood submitted two of the nine failed valves to an engineer.  (*Id.* ¶ 96.)  On November 27, 2018, NDS issued a Return Merchandise Authorization ("RMA") to TLCC for the two valves—the RMA

described the valves as "defective." (*Id.* ¶ 97.) By January 2, 2019, a total of 11 Stage III check valves had failed. (*Id.* ¶ 98.) And by late-December of 2019, multiple homeowners had raw sewage back up into their homes, although NDS disputes that the sewage resulted from check valve failures. (*Id.* ¶¶ 94, 102; Doc. 123, ¶¶ 94, 102.)

On January 29, 2020, the parties engaged Micron, Inc. to conduct a visual and microscopic inspection of 10 failed check valves. (Doc. 113-1, ¶ 103.) This inspection revealed that the ultrasonic weld intended to hold together the two pieces of the flapper assembly was incomplete. (*Id.* ¶ 104.)[3]

On April 17, 2020, Roamingwood filed its complaint. (Doc. 1.) That complaint included the causes of action before the court in this motion— strict liability (Count I) and breach of implied warranty of merchantability (Count II). (*Id.* at 13–15.) Roamingwood's amended complaint, filed on May 12, 2020, brought claims for strict liability (Count I), breach of implied warranty of merchantability (Count II), negligence (Count III), and violation of the UTPCPL (Count IV). (Doc. 9.)

As of August 31, 2022, 56 of the Stage III check valves had failed and been replaced. (Doc. 113-1, ¶ 110; Doc. 123, ¶ 110.) As of October 6, 2022,

---

[3] NDS disputes that this evidence conclusively determines the root cause of the valve failure. (Doc. 123, ¶ 104.)

Roamingwood alleged that 73 check valves had failed.  (Doc. 122, ¶ 29.)  And, as of June 29, 2023, Roamingwood alleged that 96 had failed, the most recent failure being discovered on June 16, 2023.  (Doc. 177, p. 8 n.2.)

By way of procedural background, on October 20, 2022, Roamingwood filed a motion to strike experts disclosed by NDS.  (Doc. 128.)   The court deferred ruling on that motion until it was determined whether Roamingwood's negligence claim will go to trial.  (Doc. 183.)  Per NDS' request, if the negligence claim proceeds to trial, the court will permit supplemental briefing on the motion to strike.  (Docs. 182, 183.)

On April 4, 2023, the court granted in part and denied in part the cross motions for summary judgment filed by Roamingwood and NDS.  (Doc. 165.) Specifically, the court granted NDS judgment with respect to Roamingwood's claim under the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. Ann. §§ 201-1–201-9.2 (Count IV).  The court also granted judgment in favor of Roamingwood with respect to its claims for strict liability (Count I) and breach of implied warranty of merchantability (Count II). Neither party moved for summary judgment on the remaining negligence cause of action (Count III).

On June 1, 2023, Roamingwood filed the instant motion.  (Doc. 170.)  The motion was briefed and is now ripe.  (Docs. 171, 174, 177.)  Meanwhile, on

August 7, 2023, the court dismissed O'Hara, the last third-party defendant.  (Doc.

180.)  And on October 26, 2023, the court denied O'Hara's motion to sanction

NDS.  (Doc. 186.)  The court will now address this motion to determine the scope

of damages.

**DISCUSSION**

### A. NDS' breach of the implied warranty of merchantability extends to all of the Stage III check valves.

Roamingwood asserts that this court's finding that NDS breached the

implied warranty of merchantability extends to all of the Stage III check valves and

not only those which have already failed.  (Doc. 171, pp. 6–7.)  It argues that

whether a product is merchantable under warranty law is determined at the time the

seller tenders the product, not when a defect manifests.  (*Id.* at 6 (citing § 2725(b);

*Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88 (3d Cir. 1983)).)  One way to show a

defect at the time a product is tendered is through circumstantial evidence.  (*Id.*

citing *Varner v. MHS, LTD.*, 2 F. Supp. 3d 584, 596 (M.D. Pa. 2014)).)  And when

circumstantial evidence suggests a group of products is defective, a plaintiff need

not prove every single item is defective by direct evidence.  (*Id.* at 6–7 (citing

*Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1104–05 (3d Cir.

1992); *QVC v. MJC America, Ltd.*, 904 F. Supp. 2d 466 (E.D. Pa. 2012); *Callahan

Chem. Co. v. J.W.S. Delavau Co.*, No. 94-708, 1995 U.S. Dist. LEXIS 1897 (E.D.

Pa. Feb. 14, 1995)).)

7

NDS counters that Roamingwood can only recover for those valves that have already failed.  (Doc. 174, pp. 9–10.)  It argues that Roamingwood is now trying to seek damages for "merchantable products that have not breached an implied warranty."  (*Id.* at 10.)  NDS argues that Roamingwood is not entitled to damages for the 1000+ check valves that have not yet failed and therefore are not unmerchantable.  (*Id.*)

NDS properly points out that some of the cases on which Roamingwood relies are inapplicable.  (Doc. 174, pp. 11–13.)  For example, *Gumbs*, applied the law of the U.S. Virgin Islands rather than Pennsylvania.  718 F.2d at 90.  And in *QVC*, the court's analysis did not address whether an entire batch of products was unmerchantable under the implied warranty of merchantability, but instead focused on whether the seller was in breach of specific warranties provided by contract.  904 F. Supp. 2d at 490–92.

Although NDS correctly points out the inapplicability of some of the cases on which Roamingwood relies, NDS fails to disprove Roamingwood's arguments or meaningfully distinguish the pertinent cases.  Moreover, the cases on which NDS relies are entirely inapposite.  *See, e.g., Osness v. Lasko Prods., Inc.*, 868 F. Supp. 2d 402, 414 (E.D. Pa. 2012) (finding there was no breach of implied warranty where no facts were alleged to suggest that the product was not merchantable); *Grant v. Bridgestone Firestone Inc.*, 57 Pa. D. & C. 4th 72, 84 (Pa.

Ct. Com. Pls. Jan. 10, 2002) (dismissing claim for breach of implied warranty where plaintiffs failed to show that product malfunctioned). Unlike in the cases cited by NDS, here the court has already found that NDS's check valves have failed and that NDS breached the implied warranty of merchantability.

Of the decisions cited by Roamingwood, the court finds *Altronics* to be particularly instructive. In *Altronics*, the Third Circuit affirmed the district court's determination that plaintiff's breach of implied warranties claim extended to equipment that had not failed. 957 F.2d at 1107. In that case, the plaintiffs bought three systems from the defendant. *Id.* at 1104. The first worked without issue, the second did not function properly, and the third was not installed. *Id.* The defendant argued that the district court erred in awarding damages to the plaintiffs for the cost of the third system. *Id.* at 1106. The trial court "decided that given the failure of the [second] system, it was not unreasonable for the plaintiffs to choose not to install the third system." *Id.* The Third Circuit found that conclusion to be supported by the record. It found that plaintiffs understandably feared that the third system would fail as the second had. *Id.* at 1107. Those initial fears were increased by the fact that, on inspecting the third system, parts were found to be missing. *Id.* Although the defendant's agent testified that the issue would be resolved and the missing parts supplied, their initial omission "gave added support to a reasonable belief" that "problems existed with regard to the third system." *Id.*

9

The Third Circuit further concluded that "plaintiffs' decision not to install the third system comported with the general duty to mitigate damages arising from a breach of contract." *Id.* Therefore, the court upheld the district court's inclusion of the cost of the third system as actual damages for defendant's breach. *Id.* at 1106–07. *Altronics* supports the conclusion that actual damages for a breach of implied warranty are not necessarily limited to only those products which have already failed under Pennsylvania law.

NDS argues that the Stage III valves that have not failed are akin to the functional first system in *Altronics*. (Doc. 174, p. 12.) This ignores the basic fact that the Stage III valves continue to fail. Given the number of valve failures that have occurred, Roamingwood has a reasonable fear that more valves will fail. And each additional failed valve reinforces that reasonable fear.

Another instructive decision is *Callahan*, 1995 U.S. Dist. LEXIS 1897. In that case, the chemical distributor and counterclaim defendant, "Callahan," sold mineral oil to the supplement manufacturer and counterclaim plaintiff, "Delavau". *Id.* at *3. Delavau began using the mineral oil to make tablets, but its quality control department rejected some tablets as defective because they showed visible signs of contamination. *Id.* at *5–6. Delavau investigated the cause, despite Callahan providing "no useful assistance." *Id.* at *6–7. Meanwhile, Delavau continued to manufacture tablets, in case the contaminant was later proven to be

non-toxic, but quarantined both tablets with and without indications of
contamination. *Id.* Because Delavau never identified the nature of contamination,
all 62,300,000 tablets, those with and without signs of contamination, were sent to
the landfill, presumably by Delavau. *Id.* at *7. The trial court found that the
mineral oil Callahan sold to Delavau "breached the implied warranty of
merchantability of UCC § 2314(b) because it was unfit for the ordinary purposes
for which mineral oil is used and it would not pass without objection in the trade."
*Id.* at *8–9. The court found Delavau's damages to include its cost to manufacture
and dispose of the tablets, lost profits, costs related to hiring a law firm and
laboratories to investigate and test the mineral oil, and manufacturing time lost due
to the investigation. *Id.* at *5–10.

NDS argues that *Callahan* is distinguishable because, here there is no reason
to suggest that the failure of a few check valves means that "*all* [check valves]
have malfunctioned due to a manufacturing defect." (Doc. 174, p. 14 (emphasis in
original).) NDS further argues that *Callahan* is inapposite because, there, "the
entire batch of a product *was* unmerchantable." (*Id.* (emphasis in original).) NDS
continues, "the [counterclaim] plaintiff could not sell any tablets that contained the
contaminated oil, regardless of whether the tablets [visually indicated
contamination], and so the plaintiff was entitled to recover damages for all tablets

with the contaminated oil." (*Id.* (citing 1995 U.S. Dist. LEXIS 1897, at *7).)[4]

NDS' argument implies that, in order for its breach of the implied warranty to

extend to all Stage III valves, Roamingwood must show that each and every valve

has malfunctioned. But it provides no applicable support for this proposition.

Here, the Stage III check valves are similar to the uninstalled system in *Altronics*.

Neither party can determine which valves now installed will fail and which will

not. As in *Altronics*, Roamingwood has a reasonable and understandable fear that

the remaining Stage III check valves will fail like the nearly 100 that already have.

That reasonable and understandable fear has been compounded by the growing

number of valve failures since the commencement of this litigation. NDS has

failed to point to binding on-point case law to suggest an alternate conclusion. The

court finds that NDS' breach of the implied warranty of merchantability extends to

all Stage III valves.

---

[4] This is not a finding the court explicitly made in *Callahan*. Rather, the court concluded that the mineral oil Callahan sold "breached the implied warranty of merchantability of [] § 2314(b) because it was unfit for the ordinary purpose for which mineral oil is used and would not pass without objection in the trade." 1995 U.S. Dist. LEXIS 1897, at *8.

**B. Because of its breach of implied warranty, NDS is liable for the replacement costs of the Stage III check valves as well as incidental and consequential damages.**

Because of NDS's breach, Roamingwood contends that NDS is responsible for the following direct, incidental, and consequential damages proceeding therefrom:

- Roamingwood's payments to homeowners whose check valves failed and caused property damage. (Doc. 113-1 at ¶ 108.)

- James T. O'Hara's invoice to Roamingwood for replacing 10 failed check valves in 2018.  (*Id.* at ¶ 109.)

- Roamingwood's costs to replace failed check valves using its own labor and equipment between 2018 and the present.  (*Id.* at ¶¶ 110-112.)

- The costs necessary to remove and replace the unmerchantable and defective check valves that remain installed.  (*Id.* at ¶ 114.)

- Costs associated with the inspection of failed check valves in January 2020, including the costs of LaBella & Associates investigating the check valves failures.  [(*Id.* at ¶¶ 95, 99, 103–04.)]

(Doc. 171, p. 11.)  Therefore, Roamingwood argues it should be permitted to present evidence of these alleged damages to the factfinder.  (*Id.*)  It argues that the Uniform Commercial Code (UCC), as codified by Pennsylvania statute at 13 Pa. Cons. Stat. Ann. §§ 2714 and 2715, provides for this remedy.  (*Id.* at 7–8.)

Section 2714 reads as follows:

§ 2714.  Damages of buyer for breach in regard to accepted goods.

(a)  Damages for nonconformity of tender.--Where the buyer
has accepted goods and given notification (section 2607(c)) he
may recover as damages for any nonconformity of tender the loss
resulting in the ordinary course of events from the breach of
the seller as determined in any manner which is reasonable.

(b)  Measure of damages for breach of warranty.--The measure
of damages for breach of warranty is the difference at the time
and place of acceptance between the value of the goods accepted
and the value they would have had if they had been as warranted,
unless special circumstances show proximate damages of a
different amount.

(c)  Incidental and consequential damages.--In a proper case
any incidental and consequential damages under section 2715
(relating to incidental and consequential damages of buyer) may
also be recovered.

§ 2714.

As the Pennsylvania Superior Court has stated, "these provisions permit the

buyer who has accepted goods not in conformity in an applicable warranty to

recover the difference in value of the goods as they are and as they would have

been if as warranted, unless special circumstances show proximate damages of

another amount." *Cober v. Corle*, 610 A.2d 1036, 1041 (Pa. Super. Ct. 1992).  As

the court in *Cober* further noted, comment 3 of § 2714(b) explains that the

language of the subsection "describes the usual, standard and reasonable method of

ascertaining damages in the case of breach of warranty but is not intended as an

exclusive measure." *Id.* at 1041 (citing § 2714(b) cmt 3).

Pursuant to § 2714(c), a plaintiff may recover incidental and consequential

damages in a proper case under § 2715.  Incidental damages include "any

commercially reasonable charges, expenses, or commissions in connection with effecting cover." § 2715(a). Consequential damages include "any loss resulting from general . . . requirements and needs of which the seller at the time of contracting had reason to know and which could not be reasonably prevented by cover or otherwise," as well as "injury to person or property proximately resulting from any breach of warranty." § 2715(b).[5]

Roamingwood relies on multiple cases to suggest that a "probable result of [NDS'] breach would surely be the necessity of removing the faulty equipment and replacing it with" equipment, which "would have been foreseeable at the time the parties contracted for the defendant's [] equipment." (Doc. 171, pp. 9–10 (quoting *Altronics of Bethlehem, Inc. v. Repco*, No. 89-4918, 1991 WL 133518, at *12 (E.D. Pa. July 15, 1991) *affirmed at* 957 F.2d 1102 (3d Cir. 1992)). Such damages may be recoverable where the loss is one that a "reasonable [person] in the position of the parties would have foreseen as a probable result of the breach." *Altronics*, 1991 WL 133518, at *12 (quoting *R.I. Lampus Co. v. Neville Prods. Corp.*, 378 A.2d 288, 291 (Pa. 1977); *see also Pansini v. Trane Co.*, No. 17-3948, 2019 WL 2409740, at *3 (E.D. Pa. June 7, 2010) (finding that consequential damages under

---

[5] When a seller breaches their contract with a buyer, Pennsylvania imposes a duty on a buyer to mitigate its damages or "cover" by procuring substitute goods. *Glenn Distribs. Corp. v. Carlisle Plastics, Inc.*, 297 F.3d 294, 302 (3d Cir. 2002) (citing 13 Pa. Cons. Stat. Ann. § 2712(a)). As described by the Third Circuit, "[t]hat duty is defined as making 'in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.'" *Id.* (citing § 2712(a)).

§ 2715 "may include costs incurred in removing and replacing faulty equipment.");
*English Whipple Sailyard, Ltd. v. Yawl Ardent*, 459 F. Supp. 866, 877 (W.D. Pa. 1978) ("[M]aking repairs, even though conducted by the damaged property owner himself, is recoverable as consequential damages."); *Antz v. GAF Materials Corp.*, 719 A.2d 758, 761 (Pa. Super. Ct. 1998) ("Consequential damages can include replacement labor costs."); *Cober*, 610 A.2d at 1041 (holding for a breach of warranty that costs for removing defective product and replacing it was proper).

NDS does not address these cases directly but instead argues that Roamingwood cannot recover incidental or consequential damages because the parties had no direct communications prior to or at the time the check valves were sold and were not in vertical privity. (Doc. 174, pp. 16–17.) First, because there were no direct communications, NDS alleges that it had no way of knowing about Roamingwood's requirements for the check valves. (*Id.* at 16.) Therefore, NDS argues, consequential damages are unavailable as a matter of law. (*Id.*) NDS implies that it had no way of knowing that its valves would be installed in a low pressure sewer system and that the "chain connecting NDS and Roamingwood is far too attenuated for NDS to have reason to know about the requirements of The Hideout's sewer lines and foreseen that, if the valves failed to meet those requirements, it would need to pay to excavate and replace valves in the Pocono

Mountains." (*Id.* at 17.)   Nowhere does NDS provide authority to suggest that such an exacting level of specificity is required for damages to be foreseeable.

Next, NDS argues that consequential damages are unavailable because there was no vertical privity between the parties.  (*Id.* at 17–19 (citing *Daitom, Inc. v. Pennwalt Corp.*, Civ. A. Nos. 80–2080, 80–2087, 1987 WL 93958, at *6 (D. Kan. Jan. 30, 1987) (applying Pennsylvania law)).)  NDS describes itself in this situation as "a remote seller that disclaimed all implied warranties and consequential damages when it sold the check valves to TLCC." (*Id.* at 18.)  NDS argues that, if Roamingwood can collect consequential damages in this scenario, NDS could be exposed to massive unforeseeable damages with no way to limit exposure via contract.  (*Id.* at 19.)

But the Pennsylvania code adopting the UCC "explicitly provides that incidental and consequential damages are available to purchasers in appropriate cases." *InfoComp, Inc. v. Electra Prod., Inc.*, 109 F.3d 902, 906 (3d Cir. 1997) (citing 13 Pa. Cons. Stat. Ann. §§ 2714, 2715).  Furthermore, "under Pennsylvania law the liability of manufacturers will not be waived by remote purchasers unless the disclaimer is 'clearly communicated to the remote [purchaser] prior to his or her purchase.'" *Id.* at 908 (quoting *King v. Hilton-Davis*, 855 F.2d 1047, 1053 (3d Cir. 1988).  The court has already concluded in ruling on summary judgment that

NDS has failed to show that it clearly communicated its disclaimer in this case. (Doc. 164, pp. 12–13.)

Roamingwood points out that, based on the undisputed facts from the motion for summary judgment, NDS knew that the check valves it manufactured were intended for use in a pressurized sewer system. (Doc. 171, p. 10 (citing Doc. 113-1, ¶ 64).)[6] It further underscores how NDS was aware, by December 2017, that the check valves were defective. (*Id.* (citing Doc. 113-1, ¶¶ 62–66); *see also* Doc. 123, ¶¶ 62–66.)

As this court noted in its summary judgment opinion, a "check valve has only one purpose: to allow sewage to flow in one direction but not the other." (Doc. 164, p. 22.) For the Stage III valves to do so under a pressurized system was a general requirement that NDS surely had reason to know at the time it sold the valves. This was so even if NDS did not know the identity of the end consumer or sewer operator where the valves would be used. Because Stage III valves have failed in this general requirement, of which NDS was aware, NDS' breach of warranty may have resulted in the claimed injury to property. Moreover, this injury could not have been reasonably prevented by cover or otherwise. Although NDS was aware of the defect in manufacturing, Roamingwood was not. Roamingwood only learned of the defect in the valve after they were installed and

---

[6] NDS does not dispute that it knew the check valves were used in a pressurized sewer system.

began failing.  At that point, cover or other preventative measures short of replacement were impossible.

As in *Altronics*, NDS knew that its product would be installed as part of a sewer or plumbing system and that, should its product fail, a probable result of the breach would surely be the necessity of removing the faulty equipment and replacing it with a new system.  This would have been foreseeable at the time that NDS sold the Stage III valves.  And, as in *Antz*, it would also have been foreseeable to NDS that replacing the faulty valves would incur labor costs.  719 A.2d at 761.  NDS sold unmerchantable valves.  Roamingwood unwittingly installed them at The Hideout.  Now, it is only by replacing NDS' Stage III valves with merchantable ones, and compensating Roamingwood for those incidental and consequential damages, that Roamingwood will be restored to the position it would have been in had NDS' check valves been merchantable in the first place.

As a result, the court finds that Roamingwood may present damages for its payments to homeowners whose check valves failed and caused property damage, James T. O'Hara's invoice to Roamingwood for replacing ten failed check valves in 2018, Roamingwood's costs for replacing failed check valves using its own labor and equipment between 2018 and present, costs necessary to remove and replace the remaining unmerchantable check valves that are installed, and costs associated with the inspection of failed check valves in January 2020, including the

costs of LaBella & Associates investigating the check valve failures.  Under
Pennsylvania statute and case law, Roamingwood may seek these incidental and
consequential damages under §§ 2714 and 2715.  The damages Roamingwood now
seeks are either injury to property proximately resulting from NDS' breach of
implied warranty or losses resulting from a general requirement which NDS knew
of when it contracted to sell the valves.  The court finds that NDS' breach of the
implied warranty of merchantability is the direct and proximate cause of these
damages, and Roamingwood will be permitted to present them to the factfinder.

### C. The economic loss doctrine does not apply because the parties were not in privity.

NDS argues that Roamingwood cannot pursue damages in tort, because they
are barred by the economic loss doctrine.  (Doc. 174, pp. 19–21.)  However, most
of the cases on which it relies are unpublished cases, which NDS has failed to
provide to the court as required by Local Rule 7.8(a).[7]  More importantly, NDS'

---

[7] For example, NDS cites *Dolan v. Hurt Millwork Co., Inc.*, 219 A.3d 253 (Pa. Super. Ct. 2019),
which is not otherwise available.  Instead, on Westlaw, *Dolan* only consists of a disclaimer
which reads in part as follows:

> Copies of these memorandum opinions may be obtained at the clerk's office of the
> Superior Court in the district in which the case arose. These memorandum opinions
> cannot be considered as precedent, nor can they be cited for any purpose, except when
> relevant under the doctrine of the law of the case, res judicata, or collateral estoppel and
> the memorandum is relevant to a criminal action or proceeding because it recites issues
> raised and reasons for a decision affecting the same defendant in a prior action or
> proceeding. When an unpublished memorandum is relied upon, a copy of it must be
> furnished to the other party and to the Court. (Pa.Super.Ct.R. 65.37.)

argument ignores this court's prior analysis of and holding regarding the economic

loss doctrine.  Instead, after claiming to cite multiple decisions from this district,

NDS proceeds to cite only decisions from outside of this district.  (Doc. 174,

p. 21.)[8]

Under Pennsylvania law, the economic loss doctrine applies to situations in

which "a party in privity of contract with another suffers an injury to a product

itself, resulting in a purely economic loss."  *Duquesne Light Co. v. Westinghouse*

*Elec. Corp.*, 66 F.3d 604, 620 (3d Cir. 1995).  Roamingwood argues that this

doctrine is inapplicable because there was no privity between the parties, and

Roamingwood has presented evidence of property damage, which means its

damages are not limited to a purely economic loss.  (Doc. 177, pp. 22.)  Regarding

the lack of privity, Roamingwood points out that this court in its ruling on an

earlier motion to dismiss found the following:

> [T]here is a substantial question regarding whether a contractual
> relationship was formed between the parties.  Unless and until it is
> determined that a contractual relationship exists between the parties,
> the court will not apply the economic loss doctrine to dismiss
> Roamingwood's claims for strict liability and negligence.

(Doc. 28, p. 12.)  Roamingwood argues that NDS has failed to provide any

evidence of privity between the parties.  (Doc. 177, p. 22.)  Moreover, NDS has

---

[8] In its brief, NDS acknowledges that "[t]his Court has previously relied on New Jersey's economic loss doctrine jurisprudence for guidance in interpreting Pennsylvania's."  (Doc. 174, p. 20 n.6 (citing Doc. 28, p. 15 n.6).)  But NDS ignores the substantive analysis and findings the court made in that opinion.

made extensive arguments to underscore that it was a remote seller lacking privity and a direct contractual relationship with Roamingwood. (*Id.*)

The court has already made findings regarding the economic loss doctrine. (Doc. 28, pp. 9–12.) NDS' argument fails to take those findings into account. Nor does it assert that the law on which the court's opinion rested was incorrectly stated or has changed. Lastly, NDS has not shown that a contractual relationship existed between the parties. Therefore, for the reasons provided in this court's motion to dismiss opinion, the economic loss doctrine does not apply. For that reason, the court will not preclude Roamingwood from recovering in tort.

**D. Roamingwood may present evidence of punitive damages.**

Federal Rule of Civil Procedure 54(c) provides that every final judgment, except for default judgment, "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). The Third Circuit has stated that, "[t]his does not mean, however, that there are no restrictions on the relief that may be granted" under this rule. *Evans Prods. Co. v. W. Am. Ins. Co.*, 736 F.2d 920, 923 (3d Cir. 1984). Instead, Rule 54(c) allows relief based on a given theory "only if that theory was squarely presented and litigated by the parties at some stage or other of the proceedings." *Id.* (citation omitted).

Roamingwood's amended complaint makes no specific mention of punitive damages.  (Doc. 9.)  It raises causes of action for strict liability, breach of implied warranty of merchantability, negligence, and violation of the UTPCPL, 73 Pa. Stat. §§ 201-1–201-9.2.  (*Id.* at 14–20.)  In pursuing its UTPCPL claim, Roamingwood sought "treble damages as permitted by the UTPCPL based on Defendant's knowledge of the defective condition of the check valve at the time of distribution and sale."  (*Id.* at 21.)

Roamingwood argues that, although its request for treble damages was made under the UTPCPL, it should now be permitted to seek punitive damages under strict liability because the former requires similar findings to the latter.  (Doc. 171, pp. 12–13 (citing *Schwartz v. Rockey*, 932 A.2d 885, 898 (Pa. 2007)).)

NDS responds that, because Roamingwood is seeking relief based on a theory not present in the pleadings "or tried with the express or implied consent of the parties," this court should analyze Roamingwood's request as one for unpleaded relief under Rule 15(b).  (Doc. 174, p. 22 (quoting *Evans*, 736 F.2d at 923).)  NDS further asserts that Roamingwood is incorrect in arguing that punitive damages and UTPCPL treble damages are sufficiently similar to permit the former under Rule 54(c).  (*Id.* at 22–23.)  NDS argues that, under *Schwartz*, claims for punitive damages and under the UTPCPL have different purposes, are subject to different standards, and are decided by different factfinders.  (*Id.*)

23

Treble damages under the UTPCPL are remedial in nature, "should focus on the presence of intentional or reckless, wrongful conduct," and are decided by the court and not the jury. (*Id.* (quoting *Schwartz*, 932 A.2d at 897–98) (citing *Catena v. NVR, Inc.*, 2:20-CV-00160-MJH, 2023 WL 143185, at *2 (W.D. Pa. Jan. 10, 2023) *appeal filed*).) By contrast, NDS asserts that punitive damages "may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. As the name suggest, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." (*Id.* at 23 (quoting *Hutchison v. Luddy*, 582 Pa. 114, 121 (2005)).)

Therefore, NDS argues that it would be prejudiced and deprived of the opportunity to seek summary judgment on these damages. (*Id.*) It further argues that allowing Roamingwood to present punitive damages would change the procedural complexion of the case on the eve of trial. (*Id.*)

Roamingwood responds that its strict liability claim permits punitive damages. (Doc. 177, p. 23 (citing *N. Side Foods Corp. v. Bag-Pack, Inc.*, No. 06-1612, 2007 WL 954106, at *4 (W.D. Pa. 2007)).) It further asserts that the strict liability claim was squarely presented at the summary judgment stage of the litigation, when Roamingwood was awarded summary judgment. (*Id.*)

Next, Roamingwood corrects NDS with respect to the nature of treble damages under the UTPCPL. Treble damages are not solely remedial in nature. (Doc. 177, p. 23.) Instead, the Pennsylvania Supreme Court has noted that treble damages under consumer protection statutes are "in effect, a hybrid, with both punitive and remedial aspects." *Schwartz*, 932 A.2d at 898 (citation omitted). Roamingwood points out that, in *Schwartz*, the court stated that trial courts assessing treble damages under the UTPCPL should focus on intentional or reckless conduct, which, it asserts, is also sufficient for punitive damages. (Doc. 177, pp. 23–24 (citing *L.C. v. Central Pa. Youth Ballet*, No. 09-cv-2076, 2010 WL 2650540, at *4 (M.D. Pa. 2010)).)

Roamingwood asserts that the evidence in the record supports Roamingwood presenting punitive damages to the factfinder. (*Id.* at 24.) Roamingwood argues that NDS was aware of the check valve defects prior to the first failure of a Stage III valve on May 27, 2018. (Doc. 113-1, ¶¶ 48–87.) Ahead of that date, NDS had discontinued manufacturing that type of valve, because it could not reliably manufacture valves of sufficient quality. (*Id.* at ¶¶ 70–83.) Yet, NDS continued to sell the valves based on legal advice in the hopes that it could limit legal liability by not discontinuing sales. (*Id.*) Roamingwood further asserts that, once it notified NDS that the valves were defective, NDS denied any knowledge of a defect and instead led Roamingwood on a futile search for causes,

which included inspections, meetings, and ultimately litigation.  (Doc. 177, p. 24;

Doc. 113-1, ¶¶ 95–105; Doc. 123, ¶¶ 95–105[9]).)  Therefore, Roamingwood argues

a factfinder should be permitted to decide whether NDS' conduct was intentional

or reckless in order to determine whether to award punitive damages.  (Doc. 177,

p. 24.)

   NDS' arguments misunderstand the *Schwartz* decision.  First, the

Pennsylvania Supreme Court in *Schwartz* did not limit treble damages under the

UTPCPL to being remedial in nature.  Instead, it noted, citing a North Carolina

case, that treble damages under consumer protection statues are of a hybrid nature

and have both punitive and remedial aspects.  932 A.2d at 898 (citing *Marshall v.

Miller*, 276 S.E.2d 397, 402 (1981)).  Furthermore, that case presented a central

question of "whether a finding of outrageous or egregious conduct is required to

support an aware of treble damages" under the UTPCPL.  *Id.* at 888.  The court

concluded that, "as a matter of statutory construction," a court's discretion to

award treble damages under the UTPCPL was not limited by common-law

---

[9] With one exception, the court only relies on Roamingwood's assertion of facts to the extent that
NDS has not denied them.  In paragraph 105, Roamingwood asserts that, once it raised the issue
of the defective valves, NDS' counsel responded that he would determine whether the failed
valves were part of a bad batch or if the issue was something larger.  (Doc. 113-1, ¶ 105.)  NDS
objected to the court's consideration of that evidence based on its assertion that the
correspondence at issue was excludable under Federal Rule of Evidence 408 as a settlement
communication.  (Doc. 123, ¶ 105.)  But NDS did not deny the validity of the referenced
communication, which does not on its face appear to be related to settlement discussions.  (*Id.*;
Doc. 113-13, pp. 74–76.)

requirements for punitive damages. *Id.* at 898. But in doing so, the court in *Schwartz* did not state that the standard of egregious or outrageous conduct, which NDS admits is sufficient to award punitive damages, cannot be used to prove treble damages. It merely stated that such a showing is not required for "the remedial purposes of the UTPCPL." *Id.* And, as the Pennsylvania Supreme Court has stated, punitive damages may be awarded "when a person's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton or reckless conduct." *SHV Coal, Inc. v. Cont'l Grain Co.*, 587 A.2d 702, 704 (Pa. 1991).

The court finds that the issue of whether NDS' conduct was intentional or reckless was squarely presented by Roamingwood's UTPCPL claim requesting treble damages. UTPCPL treble damages are hybrid in nature and, as described by the Pennsylvania Supreme Court in *Schwartz*, have remedial and punitive aspects.

NDS concedes that an operative standard for treble damages is "the presence of intentional or reckless, wrongful conduct." (Doc. 174, pp. 22–23.) That issue was squarely presented and litigated under Roamingwood's UTPCPL claim. Now Roamingwood wishes to be permitted to present evidence to a factfinder as to whether NDS' conduct "was intentional or reckless sufficient to award punitive damages." (Doc. 177, p. 24.) Because the issue of NDS' alleged recklessness and intentionality was squarely presented and litigated, the court will permit Roamingwood to present evidence of punitive damages.

CONCLUSION

For the reasons provided herein, the court will allow Roamingwood to present evidence of damages related to all Stage III valves on its breach of implied warranty claim.  The court will allow Roamingwood to seek not only general damages pursuant to § 2714 but also incidental and consequential damages pursuant to § 2715.  Because the economic loss doctrine is not applicable, the court will not use it to restrict Roamingwood from seeking damages in tort. Roamingwood will also be permitted to seek punitive damages and present evidence accordingly.  An appropriate order will follow.


s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: March 11, 2024

28